## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Supply Source Enterprises, Inc.*, et al.*,[1] | Case No. 24-11054 (BLS) |
| Debtors. | (Jointly Administered) |

## COMBINED JOINT CHAPTER 11 PLAN
## OF LIQUIDATION AND DISCLOSURE STATEMENT
## OF SUPPLY SOURCE ENTERPRISES, INC. AND ITS DEBTOR AFFILIATES

**POTTER ANDERSON & CORROON LLP**
M. Blake Cleary (No. 3614)
R. Stephen McNeill (No. 5210)
Katelin A. Morales (No. 6683)
Levi Akkerman (No. 7015)
Shannon Forshay (No. 7293)
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
E-mail: bcleary@potteranderson.com
        smcneill@potteranderson.com
        kmorales@potteranderson.com
        lakkerman@potteranderson.com
        sforshay@potteranderson.com

**McDERMOTT WILL & EMERY LLP**
Felicia Garber Perlman
Bradley Thomas Giordano
Carole M. Wurzelbacher
444 West Lake Street
Chicago, IL 60606-0029
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email:  fperlman@mwe.com
        bgiordano@mwe.com
        cwurzelbacher@mwe.com

Counsel for the Debtors and Debtors in Possession

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: Supply Source Enterprises, Inc. (0842); SSE Intermediate, Inc. (1772); SSE Buyer, Inc. (5901); Impact Products, LLC (7450); and The Safety Zone, LLC (4597).  The Debtors' headquarters are located at 385 Long Hill Road, Guilford, Connecticut 06437.

# TABLE OF CONTENTS

ARTICLE I: INTRODUCTION AND EXECUTIVE SUMMARY .................................................. 1

ARTICLE II: DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW .................................................................................................. 2

    A.   Defined Terms ....................................................................................................... 2

    B.   Rules of Interpretation ......................................................................................... 17

    C.   Computation of Time ........................................................................................... 18

    D.   Governing Law .................................................................................................... 18

    E.   Reference to Monetary Figures ............................................................................ 18

    F.   Controlling Document ......................................................................................... 18

ARTICLE III: BACKGROUND AND DISCLOSURES ...................................................... 18

    A.   The Debtors' Corporate History .......................................................................... 18

    B.   The Debtors' Business Operations....................................................................... 19

    C.   The Debtors' Prepetition Capital Structure......................................................... 20

    D.   Circumstances Leading to These Chapter 11 Cases ............................................ 22

    E.   The Chapter 11 Cases .......................................................................................... 25

    F.   The Committee Settlement .................................................................................. 28

ARTICLE IV: ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS..................... 30

    A.   Administrative Claims ......................................................................................... 30

    B.   Professional Fee Claims....................................................................................... 31

    C.   Priority Tax Claims.............................................................................................. 32

    D.   Statutory Fees and Related Reporting Obligations............................................. 32

ARTICLE V: CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 33

    A.   Classification of Claims and Interests................................................................. 33

    B.   Treatment of Claims and Interests ...................................................................... 34

    C.   Special Provision Governing Unimpaired Claims............................................... 36

11584845v.10

D.   Subordinated Claims ........................................................................................ 36

E.   Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes .............. 37

F.   Nonconsensual Confirmation ............................................................................ 37

G.   Acceptance or Rejection of the Plan ................................................................... 37

     1. Voting Classes ............................................................................................ 37

     2. Presumed Acceptance of the Plan ................................................................. 37

     3. Presumed Rejection of the Plan ................................................................... 37

H.   Controversy Concerning Impairment .................................................................. 37

I.   No Waiver ..................................................................................................... 37

ARTICLE VI: CONFIRMATION AND VOTING PROCEDURES ........................................... 38

A.   Confirmation Procedures ................................................................................. 38

B.   Procedure for Objections ................................................................................. 38

C.   Requirements for Confirmation ......................................................................... 38

D.   Classification of Claims and Interests ................................................................. 39

E.   Impaired Claims or Interests ............................................................................ 39

F.   Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code ..... 40

G.   Feasibility .................................................................................................... 41

H.   Best Interests Test and Liquidation Analysis ....................................................... 42

ARTICLE VII: MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 43

A.   Restructuring Transactions .............................................................................. 43

B.   Sources of Consideration for Plan Distributions ................................................... 43

C.   The Liquidation Trust ..................................................................................... 43

D.   Cancellation of Securities and Agreements .......................................................... 44

E.   Corporate Action ........................................................................................... 44

F.   Effectuating Documents; Further Transactions ..................................................... 45

G.    Section 1146 Exemption ................................................................................ 45

H.    Preservation of Retained Causes of Action ................................................... 45

I.    Health and Benefit Plans of the Debtors and Post-Effective Date Debtors ...................... 46

J.    Closing the Chapter 11 Cases ....................................................................... 46

K.    U.S. Securities and Exchange Commission .................................................... 46

ARTICLE VIII: SUBSTANTIVE CONSOLIDATION ..................................................... 47

ARTICLE IX: TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ......................................................................................................... 48

A.    Rejection of Executory Contracts and Unexpired Leases ................................ 48

B.    Insurance Policies ....................................................................................... 49

C.    Indemnification Obligations ......................................................................... 50

D.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ...................... 50

E.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired
Leases ........................................................................................................ 51

F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 51

G.    Reservation of Rights ................................................................................... 51

H.    Nonoccurrence of Effective Date .................................................................. 51

ARTICLE X: CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ....... 52

A.    The Plan May Not Be Accepted ................................................................... 52

B.    The Plan May Not Be Confirmed ................................................................. 52

C.    Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with
Projections ................................................................................................. 52

D.    Objections to Classification of Claims .......................................................... 53

E.    Failure to Consummate the Plan ................................................................... 53

F.    Debtor Release and/or Injunction Provisions May Not Be Approved ............................. 53

G.    Reductions to Estimated Creditor Recoveries ................................................ 54

H.    Certain Tax Considerations................................................................... 54

ARTICLE XI: THE LIQUIDATION TRUST AND THE LIQUIDATION TRUSTEE ............. 60

A.    Liquidation Trust Criteria ................................................................... 60

B.    Purpose of the Liquidation Trust ....................................................... 61

C.    The Liquidation Trust Assets............................................................. 61

D.    Beneficiaries of the Liquidation Trust .............................................. 63

E.    Distribution of the Liquidation Trust Assets ..................................... 63

F.    Transfer of Assets to the Liquidation Trust ...................................... 64

G.    Interests in the Liquidation Trust Assets ........................................... 65

H.    Appointment of the Liquidation Trustee............................................ 65

I.    Rights and Powers of the Debtors and the Liquidation Trustee ....... 65

J.    Distribution and Withholding ............................................................ 65

K.    Insurance ............................................................................................ 65

L.    Other Rights and Remedies ............................................................... 66

M.    Priority Claims Reserve .................................................................... 66

N.    Disputed Claims Reserve .................................................................. 66

O.    Attribution of Income ........................................................................ 67

P.    Current Basis...................................................................................... 67

Q.    Tax Identification Numbers ............................................................... 67

R.    Wind Down......................................................................................... 68

S.    Termination of the Liquidation Trust and Liquidation Trustee ........ 68

T.    Transfer of Beneficial Interests......................................................... 69

ARTICLE XII: PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 69

A.    Timing and Calculation of Amounts to Be Distributed .................... 69

B.    Delivery of Distributions and Undeliverable, Unclaimed, of Forfeited Distributions ..... 69

11584845v.10

C.    Compliance with Tax Requirements .................................................................. 71

D.    Allocations ....................................................................................................... 72

E.    No Postpetition Interest on Claims ................................................................... 72

F.    Foreign Currency Exchange Rate ..................................................................... 72

G.    Setoffs and Recoupment .................................................................................. 72

H.    Claims Paid or Payable by Third Parties .......................................................... 73

ARTICLE XIII: PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS AND INTERESTS ................................................................... 73

A.    Allowance of Claims and Interests ................................................................... 73

B.    Prosecution of Objections to Claims and Interests ........................................... 74

C.    Estimation of Claims ........................................................................................ 74

D.    Expungement or Adjustment to Claims Without Objections ............................ 75

E.    Time to File Objections to Claims ..................................................................... 75

F.    Disallowance of Claims .................................................................................... 75

G.    Amendments to Claims ..................................................................................... 76

H.    No Distributions Pending Allowance ................................................................ 76

I.    Distributions After Allowance .......................................................................... 76

ARTICLE XIV: SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS 76

A.    Termination of Claims and Interests ................................................................. 76

B.    Release of Liens ................................................................................................ 77

C.    Releases by the Debtors .................................................................................... 77

D.    HIG Releases .................................................................................................... 78

E.    Exculpation ....................................................................................................... 78

F.    Injunction ......................................................................................................... 79

G.    Protections Against Discriminatory Treatment ................................................. 79

H.    Document Retention ......................................................................................... 80

I.   Reimbursement or Contribution ................................................................. 80

J.   Term of Injunctions or Stays.................................................................... 80

ARTICLE XV: CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ......... 80

A.   Conditions Precedent to the Effective Date ............................................. 80

B.   Waiver of Conditions................................................................................ 81

C.   Effect of Failure of Conditions ................................................................ 81

ARTICLE XVI: MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .... 81

A.   Modification and Amendments.................................................................. 81

B.   Effect of Confirmation on Modifications ................................................. 82

C.   Revocation or Withdrawal of Plan............................................................ 82

ARTICLE XVII: RETENTION OF JURISDICTION ................................................. 82

ARTICLE XVIII: MISCELLANEOUS PROVISIONS ................................................ 84

A.   Immediate Binding Effect......................................................................... 84

B.   Additional Documents .............................................................................. 85

C.   Reservation of Rights................................................................................ 85

D.   Successors and Assigns............................................................................. 85

E.   Dissolution of the Committee ................................................................... 85

F.   Notices ...................................................................................................... 86

G.   Entire Agreement ...................................................................................... 88

H.   Exhibits ..................................................................................................... 88

I.   Non-Severability of Plan Provisions......................................................... 88

J.   Votes Solicited in Good Faith................................................................... 88

K.   Closing of Chapter 11 Cases..................................................................... 88

11584845v.10

## DISCLAIMERS

EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.  THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS.  THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT.  CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

1

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT.   THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL.  THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS.  ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTORS ARE FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE EXHIBITS HERETO, THE CONFIRMATION NOTICE, AND A BALLOT OR NOTICE OF NON-VOTING STATUS, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL.  THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED.  NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.

2

# ARTICLE I
## INTRODUCTION AND EXECUTIVE SUMMARY[2]

The Debtors propose the following Combined Plan and Disclosure Statement pursuant to sections 1121(a) and 1125(b) of the Bankruptcy Code.

The Plan provides for the disposition of the Debtors' Assets and the distribution of the proceeds in accordance with the priorities and requirements of the Bankruptcy Code. As of the expected Confirmation Date, the Assets will largely consist of Cash and Retained Causes of Action.

The Plan provides for creation of a Liquidation Trust and the appointment of the Liquidation Trustee to serve as the sole director, officer, shareholder, and manager of the Debtors. The Liquidation Trustee will ultimately wind down the Debtors' business affairs and be empowered to, among other things, administer and liquidate all Assets, object to and settle Claims, and prosecute Retained Causes of Action in accordance with the Plan. The Plan provides for the payment of Wind Down Expenses and Distributions to Holders of Allowed Claims, including Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Statutory Fees, Miscellaneous Secured Claims, and General Unsecured Claims. In addition, the Plan cancels all Interests in the Debtors, and provides for the dissolution and wind up of the Debtors' affairs.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

The classification of Claims and Interests against the Debtor pursuant to the Plan is as set forth below and as further detailed in Article V hereof. The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distributions received by Holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Plan and Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

---

[2] Capitalized terms in this section, not otherwise defined herein, shall have the meanings ascribed to them below, in Article II.

1

| Class | Claim/Interest | Estimated Allowed Amount of Claims[3] | Status | Voting Rights | Projected Recovery[4] |
|---|---|---|---|---|---|
| 1 | Miscellaneous Secured Claims | $[] | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 2 | Other Priority Claims | $[] | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 3 | General Unsecured Claims | $[] - $[] | Impaired | Entitled to Vote | 0-100% |
| 4 | Subordinated Claims | $[0.00] | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| 5 | Existing Equity | $[] | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

## ARTICLE II
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

### A.    Defined Terms

As used in this Combined Plan and Disclosure Statement, capitalized terms have the meanings ascribed to them below.

1.    "**ABL Agent**" means ACF Finco I LP, as administrative agent and collateral agent under the ABL Credit Agreement.

2.    "**ABL Collateral**" means the collateral granted to the ABL Agent, for the benefit of itself and the other ABL Secured Parties, pursuant to the ABL Documents, as more fully detailed in the ABL Documents and Article III.C.1 herein.

3.    "**ABL Credit Agreement**" means that certain credit agreement dated June 30, 2020 by and among the ABL Loan Parties and the ABL Secured Parties providing for the Prepetition

---

[3] These amounts represent estimated Allowed Claims against the Debtors and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise.  The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and all objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[4] The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims against the Debtors in the Chapter 11 Cases.  As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated.  Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court and the actual amount of cash available for Distribution.

11584845v.10

ABL Facility, as amended, restated, amended and restated, supplemented, and/or otherwise modified from time to time.

4.    "**ABL Documents**" means the ABL Credit Agreement and the Loan Documents (as defined in the ABL Credit Agreement).

5.    "**ABL GCA**" means that certain guarantee and collateral agreement dated as of June 30, 2020 entered into in connection with the ABL Credit Agreement, as amended, restated, amended and restated, supplemented, and/or otherwise modified from time to time.

6.    "**ABL Loan Parties**" means Debtors SSE Intermediate, SSE Buyer, Impact Products, and Safety Zone.  The ABL Loan Documents were later amended to include Debtor Supply Source as an ABL Loan Party.

7.    "**ABL Secured Parties**" means, collectively, the Prepetition ABL Lenders and the ABL Agent.

8.    "**Additional Excluded Cash**" means the line item in the Wind Down Budget titled 'Additional Excluded Cash' in the amount of $1,350,000.000, per the Final DIP Order.

9.    "**Administrative Claim**" means a Claim (other than a Claim of the DIP Lender and Prepetition Secured Parties) for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; and (b) Allowed Professional Fee Claims in the Chapter 11 Cases.

10.    "**Administrative Claim Bar Date**" means, for any unpaid Administrative Claim arising on or between July 27, 2024 and the Effective Date, the date that is 30 calendar days after service of the notice of Effective Date, with such date to be provided in the notice of Effective Date, *provided, however*, Professional Fee Claims shall cover the period beginning from each Professional's retention date pursuant to an order of the Bankruptcy Court and the Effective Date. Administrative Claims arising from the Petition Date through and including July 26, 2024 are governed by the Bar Date Order and subject to the administrative claim bar date set therein.

11.    "**Affiliate**" means an "affiliate" as defined in Bankruptcy Code section 101(2).

12.    "**Allowed**" means with reference to any Claim, proof of which was properly Filed or, if no Proof of Claim was filed, that has been or hereafter is listed by a Debtor on its Schedules and Statements as liquidated in amount and not disputed or contingent and, in each case, as to which: (a) no objection to allowance has been interposed within the applicable period fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bankruptcy Court; or (b) an objection has been interposed and such Claim has been allowed by the Bankruptcy Court, in whole or in part, by a Final Order.

13.    "**Assets**" means any and all right, title, and interest of the Debtors in and to property of whatever type or nature, real or personal, tangible or intangible, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases,

subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, works in progress, accounts, chattel paper, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, Causes of Action, Claims, other causes of action, and any general intangibles, but specifically excludes the Purchased Assets.

14.    "**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action that may be brought by or on behalf of any Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action under sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

15.    "**Ballot**" means the ballots upon which certain Holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Combined Plan and Disclosure Statement and the Voting Instructions.

16.    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

17.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of (a) the withdrawal of reference under section 157 of the Judicial Code or (b) the entry of an order or judgment for which it is determined the United States Bankruptcy Court for the District of Delaware does not have constitutional authority to enter such order or judgment and the parties to such dispute do not consent to entry of such order or judgment by the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware.

18.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

19.    "**Bar Date**" means, collectively, the applicable dates (including the Administrative Claim Bar Date) by which Proofs of Claim and requests for payment of Administrative Claims must be filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Combined Plan and Disclosure Statement.

20.    "**Bar Date Order**" means the *Order (I) Establishing Deadlines for the Filing of Proofs of Claim and Requests for Allowance of Administrative Expense Claims, (II) Approving the Forms and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 210].

21.    "**Beneficiaries**" means the Holders of a Liquidation Trust Interest, whether individually or as agent on behalf of one or more other Entities.  To the extent Holders of Allowed Claims are entitled to Distribution from the Liquidation Trust in accordance with the terms of the Combined Plan and Disclosure Statement, such Holders are each a Beneficiary.

22.    "**Bidding Procedures**" means the procedures governing the auction and Sale, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

23.     "**Bidding Procedures and Sale Motion**" means the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Designating the Stalking Horse Bidder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 16].

24.     "**Bidding Procedures Order**" means the *Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Designating the Stalking Horse Bidder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief* [Docket No. 173].

25.     "**Board of Directors**" means the members of the Debtors' board of directors from any time prior to or after the Petition Date through the Effective Date.

26.     "**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

27.     "**Cash**" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

28.     "**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any Avoidance Action or state law fraudulent transfer claim.

29.     "**Chapter 11 Cases**" means the chapter 11 cases initiated by the Debtors' filing of voluntary petitions on the Petition Date for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered by the Bankruptcy Court under Case No. 24-11054 (BLS).

30.     "**Claim**" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtors and the Debtors' Estates.

31.     "**Claims Register**" means the official register of Claims maintained by the Notice, Claims, and Solicitation Agent.

32.     "**Class**" means a class of Claims or Interests as set forth in Article V of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

33.     "**Closing Date**" means the day the Sale closed, or July 19, 2024.

34.     "**Combined Plan and Disclosure Statement**" means this combined chapter 11 plan of liquidation and disclosure statement (the disclosure statement portion, the "Disclosure Statement" and the chapter 11 portion, the "Plan") including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time, including those set forth in the Plan Supplement.

35.     "**Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases on June 3, 2024.

36.     "**Committee Retention Applications**" means the applications the Committee filed in these Chapter 11 Cases seeking to retain certain Professionals pursuant to sections 327, 328, and/or 363 of the Bankruptcy Code.

37.     "**Committee Settlement**" means the settlement the Debtors, the Committee, the Prepetition Secured Parties, the DIP Lender, and HIG reached, as memorialized in the Final DIP Order and further described in Article III.F herein.

38.     "**Company**" means, collectively, Supply Source and each of its Debtor and non-Debtor Affiliates.

39.     "**Confirmation**" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

40.     "**Confirmation Date**" means the date upon which Confirmation occurs.

41.     "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

42.     "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

43.     "**Consummation**" means the occurrence of the Effective Date.

44.     "**Creditor**" means any Person that is the Holder of a Claim against the Debtors as defined in Bankruptcy Code section 101(10).

45. "**Cure Claim**" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

46. "**D&O Liability Insurance Policies**" means all Insurance Policies (including any "tail policy") issued or providing coverage to the Debtors for liabilities against any of the Debtors' current or former directors, managers, and officers, and all agreements, documents, or instruments relating thereto.

47. "**Debt Purchase Transaction**" means the transaction whereby the Purchaser purchased the Prepetition ABL Facility and Prepetition Term Loan Facility.

48. "**Debtor Retention Applications**" means the applications the Debtors filed in these Chapter 11 Cases seeking to retain certain Professionals pursuant to sections 327, 328, and/or 363 of the Bankruptcy Code.

49. "**Debtors**" means, collectively: (a) SSE Intermediate, Inc. ("SSE Intermediate"); (b) SSE Buyer, Inc. ("SSE Buyer"); (c) Supply Source Enterprises Inc. ("Supply Source"); (d) Impact Products, LLC ("Impact Products"); and (e) The Safety Zone, LLC ("Safety Zone").

50. "**DIP Credit Agreement**" means that certain Debtor in Possession Secured Multi-Draw Term Promissory Note, dated as of May 21, 2024, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

51. "**DIP Financing**" means the senior secured debtor in possession financing obtained by the Debtors, pursuant to the DIP Orders.

52. "**DIP Financing Motion**" means the *Debtors' Motion for Entry of Interim and Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Senior Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 14].

53. "**DIP Lender**" means TZ SSE Buyer LLC.

54. "**DIP Obligations**" means all "Obligations" (as defined in the DIP Credit Agreement).

55. "**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

56. "**Disallowed**" means, with respect to any Claim, or any portion thereof, that such Claim, or any portion thereof, is disallowed under the Plan, the Bankruptcy Code, or a Final Order.

57. "**Disclosure Statement Order**" means the order (a) conditionally approving the disclosure statement-related provisions of this Combined Plan and Disclosure Statement and (b) approving the Solicitation Procedures.

11584845v.10

58.    "**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest that (a) is not yet Allowed and (b) is not Disallowed.

59.    "**Disputed Claims Reserve**" means a Cash reserve, if any, that may be funded by the Liquidation Trustee with a portion of the Liquidation Trust Assets for distributions to Beneficiaries holding Disputed Claims if and to the extent that such Disputed Claims become Allowed Claims.

60.    "**Distribution**" means any distribution to the Holders of Allowed Claims against the Debtors pursuant to the Combined Plan and Disclosure Statement.

61.     "**Distribution Record Date**" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the first day of the Confirmation Hearing, or such other date as is announced by the Debtors or designated in a Final Order of the Bankruptcy Court.

62.    "**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date set forth in Article XV.A of the Combined Plan and Disclosure Statement have been satisfied or waived pursuant to Article XV.B of the Combined Plan and Disclosure Statement, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

63.    "**Entity**" means an "entity" as defined in Bankruptcy Code section 101(15).

64.    "**Estates**" means the estates created on the Petition Date for the Debtors in their Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

65.    "**Escrow Amounts Transfer Date**" means the date on which the Remaining Professional Fee Escrow Amounts (if any) are transferred to the Liquidation Trust.

66.    "**Excess Cash**" means any cash on hand plus undrawn amounts under the DIP Credit Agreement in excess of the amount required to fund any amounts expressly set forth in the Specified Wind Down Budget (as defined in the DIP Credit Agreement).

67.    "**Excluded Asset**" means any Asset not purchased by the Purchaser pursuant to the Sale Order and the Stalking Horse APA.

68.    "**Excluded Excess Cash**" means $600,000.00.

69.    "**Excluded Vendors**" means those vendors of the Debtors' whose Avoidance Actions against them are not related to the Purchased Assets and are, thus, Excluded Assets.  A list of Excluded Vendors is set forth in schedule 2.2(n) to the Stalking Horse APA and shall be included in the Plan Supplement.

70. "**Exculpated Party**" means collectively, and in each case in its capacity as such, (a) the Debtors, (b) the directors, managers, officers, consultants, and employees of the Debtors who served in such capacity between the Petition Date and the Effective Date, (c) the Professionals retained by the Debtors in the Chapter 11 Cases, except for Ordinary Course Professionals, (d) the Committee, (e) the members of the Committee, and (f) the Professionals retained by the Committee.

71. "**Executory Contract**" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

72. "**Federal Judgment Rate**" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

73. "**File**" or "**Filed**" means file or filed with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim (including for any Administrative Claim) or Proof of Interest, the Notice, Claims, and Solicitation Agent.

74. "**Final Decree**" means the order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Cases.

75. "**Final DIP Order**" means the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 184].

76. "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be filed relating to such order shall not cause such order to not be a Final Order.

77. "**First Day Declaration**" means the *Declaration of Thomas Studebaker in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 3].

78. "**First Day Motions**" means the customary motions the Debtors with their voluntary petitions for relief under chapter 11 designed to facilitate the administration of these Chapter 11 Cases, as further detailed in Article III.E herein.

11584845v.10

79. "**General Unsecured Claim**" means any unsecured Claim against the Debtors which is not an Administrative Claim, Professional Fee Claim, Priority Tax Claim, Miscellaneous Secured Claim, Other Priority Claim, Subordinated Claim, or Existing Equity.

80. "**Governmental Unit**" means a "governmental unit" as defined in Bankruptcy Code section 101(27).

81. "**GUC Recovery**" means the Liquidation Trust Assets, after payment of all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Allowed Class 1 Miscellaneous Secured Claims, Allowed Class 2 Other Priority Claims, and Wind Down Expenses.

82. "**HIG**" means H.I.G. Capital LLC, H.I.G. Advantage Buyout Fund, L.P., H.I.G. Whitehorse Equity Side-Car, L.P., H.I.G. Capital Finance, LLC, and all of its Related Parties.

83. "**HIG Claim**" means any and all Claims of HIG against the Debtors, the Debtors' Estates, and the Purchaser Released Parties (as defined in the Stalking Horse APA).

84. "**Holder**" means an Entity holding a Claim against or an Interest in any Debtor.

85. "**Impaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

86. "**Independent Director**" means the independent director of SSE Parent, Laura Marcero.

87. "**Initiatives**" means certain initiatives the Debtors took in the spring of 2023 to improve performance, as further described in Article III.D.2 herein.

88. "**Insurance Policies**" means all insurance policies that have been issued at any time to or provide coverage to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

89. "**Insurer**" means any company or other Entity that issued or entered into an Insurance Policy, any third party administrator, and any respective predecessors and/or affiliates thereof.

90. "**Intercreditor Agreement**" means that certain amended and restated intercreditor agreement, dated as of December 5, 2022, by and among the Term Loan Agent, the ABL Agent, SSE Intermediate, and SSE Buyer, as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

91. "**Interest**" means any equity security as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not

10

certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

92.　　"**Interim DIP Order**" means the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 49].

93.　　"**IRS**" means Internal Revenue Service.

94.　　"**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

95.　　"**KERP Order**" means the *Order (I) Authorizing Assumption of Certain Employee Retention Agreements and (II) Approving Key Employee Retention Plan for Non-Insider Employees* [Docket No. 154].

96.　　"**Liquidation Trust**" means the liquidation trust established on the Effective Date pursuant to the Liquidation Trust Agreement and the Combined Plan and Disclosure Statement for the purpose of administering the Liquidation Trust Assets and to make one or more Distribution(s) to Beneficiaries.

97.　　"**Liquidation Trust Agreement**" means the trust agreement, and related documents, that document and govern the powers, duties, and responsibilities of the Liquidation Trustee, and which agreement will be materially consistent with and subject to the Combined Plan and Disclosure Statement and otherwise in the substance and form included in the Plan Supplement.

98.　　"**Liquidation Trust Assets**" shall consist of (a) Retained Causes of Action; (b) any other Claims and Causes of Action that are not Purchased Assets under the Sale Order; (c) any other remaining Assets of the Estates, including, without limitation, the Additional Excluded Cash, Excluded Excess Cash, and the Remaining Professional Fee Escrow Amounts, if any; and (d) the proceeds of each of the foregoing.

99.　　"**Liquidation Trust Expenses**" means all actual and necessary fees, costs, expenses, and obligations incurred or owed by the Liquidation Trustee or its agents, employees, attorneys, advisors, or other Professionals in administering the Combined Plan and Disclosure Statement and the Liquidation Trust (including, without limitation, reasonable compensation for services rendered, and reimbursement for actual and necessary expense incurred by the Liquidation Trustee and its agents, employees, and Professionals) arising after the Effective Date through and including the date upon which the Bankruptcy Court enters a Final Decree closing the Chapter 11 Cases, which shall be solely payable from the Liquidation Trust Assets prior to any Distribution to Beneficiaries.

100.　　"**Liquidation Trust Interests**" means the non-certificated beneficial interests of the Liquidation Trust allocable to Holders of Allowed Claims in accordance with the terms of the

Combined Plan and Disclosure Statement and the Liquidation Trust Agreement, which may or may not be transferable.

**101.** "**Liquidation Trustee**" means the Person selected to administer the Liquidation Trust under the Liquidation Trust Agreement and as identified in the Plan Supplement and the Liquidation Trust Agreement.

**102.** "**Marketing Process**" means the process Portage Point undertook to market the sale of all or substantially all of the Debtors' business and assets, as further described in Article III.D.2 herein.

**103.** "**Notice, Claims, and Solicitation Agent**" means Kurtzman Carson Consultants, LLC d/b/a Verita Global, in its capacity as the notice, claims, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

**104.** "**OCP Order**" means the *Order (I) Authorizing Debtors to Employ Professionals Utilized in the Ordinary Course of Business, (II) Waiving Certain Information Requirements of Local Rules 2016-2, and (III) Granting Related Relief* [Docket No. 125].

**105.** "**Ordinary Course Professionals**" means Professionals retained pursuant to the OCP Order.

**106.** "**Other Priority Claim**" means any Claim (other than a Claim of the DIP Lender and Prepetition Secured Parties), to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**107.** "**Miscellaneous Secured Claim**" means Claims (other than Claims of the DIP Lender and the Prepetition Secured Parties) which are: (a) secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (i) as set forth in the Combined Plan and Disclosure Statement, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with Bankruptcy Code section 506(a); or (b) subject to a valid right of setoff under Bankruptcy Code section 553.

**108.** "**Person**" means a "person" as defined in Bankruptcy Code section 101(41).

**109.** "**Petition Date**" means May 21, 2024.

**110.** "**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court. The Plan Supplement will contain, among other things: (a) a liquidation analysis; (b) the Liquidation Trust Agreement; (c) the identity of the Liquidation Trustee; (d) a schedule of Retained Causes of Action; (e) the Wind Down Budget; and (f) any other disclosures as required by the Bankruptcy Code.

111.    "**Portage Point**" means Triple P RTS, LLC.

112.    "**PPE**" means personal protective equipment.

113.    "**Prepetition ABL Facility**" means that certain $45 million asset-based loan revolving credit facility entered into by and among the ABL Loan Parties and the ABL Secured Parties, pursuant to the ABL Credit Agreement.

114.    "**Prepetition ABL Lenders**" means the lenders under the ABL Credit Agreement.

115.    "**Prepetition ABL Obligations**" means the Debtors' obligations under the ABL Documents as further detailed in the ABL Documents and Article III.C.1 herein.

116.    "**Prepetition Collateral**" means, collectively, the Term Loan Collateral and the ABL Collateral.

117.    "**Prepetition Secured Obligations**" means, collectively, the Prepetition Term Loan Obligations and the Prepetition ABL Obligations.

118.    "**Prepetition Secured Parties**" means, collectively, the (a) ABL Secured Parties and (b) Term Loan Secured Parties.

119.    "**Prepetition Secured Party Deficiency Claim**" means the Claims of the Prepetition Secured Parties for any remaining Prepetition Secured Obligations following the Closing Date.

120.    "**Prepetition Term Loan Facility**" means that certain $110 million term loan credit facility entered into by and among Term Loan Parties and the Term Loan Secured Parties, pursuant to the Term Loan Credit Agreement.

121.    "**Prepetition Term Loan Obligations**" means the Debtors' obligations under the Term Loan Documents as further detailed in the Term Loan Documents and Article III.C.2 herein.

122.    "**Priority Claims Reserve**" means a reserve to be funded on the Effective Date by the Debtors or the Liquidation Trustee, as applicable, to pay all anticipated Allowed Priority Tax Claims and Allowed Other Priority Claims, to the extent such Claims are not Allowed and paid by the Debtors on the Effective Date.  The Priority Claims Reserve shall be maintained by and administered by the Liquidation Trustee.

123.    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

124.    "**Professional**" means an Entity retained pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

13

125.    "**Professional Fee Claim**" means any Administrative Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.

126.    "**Professional Fee Escrow Account**" means an account, which may be interest-bearing, funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

127.    "**Professional Fee Escrow Amount**" means the total amount of unpaid Professional fees and expenses estimated pursuant to Article IV.B.3 of the Plan.

128.    "**Proof of Claim**" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

129.    "**Proof of Interest**" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

130.    "**Purchased Assets**" means the "Purchased Assets" as defined in the Stalking Horse APA.

131.    "**Purchaser**" means TZ SSE Buyer LLC.

132.    "**Related Parties**" means, to the fullest extent permitted by law, with respect to any Entity, such Entity's predecessors, successors, assigns, subsidiaries, and Affiliates (whether by operation of Law or otherwise), and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former equity holders (regardless of whether such Interests are held directly or indirectly), officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors, direct and indirect parent Entities, "controlling persons" (within the meaning of the federal securities law), heirs, administrators, and executors, and other Professionals, in each case acting in such capacity whether current or former.

133.    "**Release Letter**" means the Release Letter dated July 19, 2024 executed by and between SSE Buyer, Inc., as Borrower, and TZ SSE Buyer LLC, as DIP Lender.

134.    "**Released Party**" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) HIG; (c) the Prepetition Secured Parties; (d) the DIP Lender; (e) the Purchaser; (f) Committee (but not its members) and its Professionals; (g) as to the foregoing (a) through (e) each such Entity's current and former Affiliates, subsidiaries, officers, directors, independent directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants (except for accountants who provided audit services to the Debtors), investment bankers, consultants, representatives, and other Professionals, each in their capacity as such; and (h) the Committee members, in their individual capacities as Committee members.

135.    "**Remaining Professional Fee Escrow Amounts**" means any remaining funds held in the Professional Fee Escrow Account after all Professional Fee Claims Allowed by the

Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.

136. "**Restructuring Transactions**" means the transactions described in Article VII.A of the Plan.

137. "**Retained Causes of Action**" means, collectively, all Causes of Action which do not constitute Purchased Assets under the Stalking Horse APA, including, but not limited to: (a) the Avoidance Actions against the Excluded Vendors; (b) any other rights, claims, or causes of action of the Debtors of any kind against the Excluded Vendors; and (c) the action filed against Access Partners, Inc. and Paul Haddad under Case No. 1:24-cv-00195.

138. "**Sale Order**" means the *Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 222].

139. "**Sale**" means those certain transactions between the Debtors and the Purchaser as set forth in the Stalking Horse APA.

140. "**Schedules and Statements**" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may have been or may be amended, modified, or supplemented from time to time.

141. "**SEC**" means the United States Securities and Exchange Commission.

142. "**Secured**" means when referring to a Claim: (a) secured by a lien on property in which the applicable Estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's valid interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan as a Secured Claim.

143. "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

144. "**Security**" means a security as defined in section 2(a)(1) of the Securities Act.

145. "**SKU**" means stock keeping unit.

146. "**Solicitation Date**" means the date upon which the Debtors commence the solicitation process in accordance with the Disclosure Statement Order.

147. "**Solicitation Procedures**" means that form of solicitation procedures approved by the Disclosure Statement Order.

148. "**Sourcing Partners**" means Shanghai Soro Industrial Supply Co. Ltd. and Safety Zone Resources SDN.BHD, with whom the Debtors sourced their inventory.

149. "**Special Committee**" means that certain committee created by the board of non-Debtor SSE Parent composed of the Independent Director.

150. "**SSE Parent**" means non-Debtor Affiliate SSE Parent GP, LLC.

151. "**Stalking Horse APA**" means the asset purchase agreement attached to the Sale Order and amended by Amendment No. 1 and Amendment No. 2, which appear at Docket No. 257, and as may be further amended from time to time.

152. "**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, and any interest thereupon.

153. "**Term Loan Agent**" means Ares Capital Corporation, as administrative agent and collateral agent under the Term Loan Credit Agreement.

154. "**Term Loan Collateral**" means the collateral granted to the Term Loan Agent, for the benefit of itself and the other Term Loan Secured Parties, pursuant to the Term Loan Documents, as more fully detailed in the Term Loan Documents and Article III.C.2 herein.

155. "**Term Loan Credit Agreement**" means that certain credit agreement, dated as of June 30, 2020 by and among the Term Loan Parties and the Term Loan Secured Parties providing for the Prepetition Term Loan Facility, as amended, restated, amended and restated, supplemented, and/or otherwise modified from time to time.

156. "**Term Loan Documents**" means, collectively, the Term Loan Credit Agreement and the Loan Documents (as defined in the Term Loan Credit Agreement).

157. "**Term Loan GCA**" means that certain guarantee and collateral agreement dated as of June 30, 2020 entered into in connection with the Term Loan Credit Agreement, as may be amended and as may be further amended, restated, amended and restated, supplemented, and/or otherwise modified from time to time.

158. "**Term Loan Lenders**" means the lenders under the Term Loan Credit Agreement.

159. "**Term Loan Parties**" means Debtors SSE Intermediate and SSE Buyer.  The Term Loan Documents were later amended to include Debtors Supply Source, Impact Products, and Safety Zone as Term Loan Parties.

160. "**Term Loan Secured Parties**" means, collectively, the Term Loan Agent and the Term Loan Lenders.

161. "**U.S.**" means the United States of America.

162. "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

11584845v.10

**163.** "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

**164.** "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**165.** "**Voting Deadline**" means 4:00 p.m. (ET) on _____ __, 2024.

**166.** "**Voting Instructions**" means the instructions for voting on the Plan contained on the Ballot.

**167.** "**Wind Down Budget**" means a budget for Wind Down Expenses, as set forth in the Plan Supplement, which shall be in form and substance acceptable to the Committee.

**168.** "**Wind Down Expenses**" means the expenses to be incurred in complying with the Combined Plan and Disclosure Statement and winding down the Chapter 11 Cases, including, but not limited to, the liquidation of any residual assets, preparation and filing of final tax returns, making distributions to Holders of Allowed Claims, and the dissolution of each Debtor Entity.

## B.     Rules of Interpretation

For purposes of this Combined Plan and Disclosure Statement: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Combined Plan and Disclosure Statement or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Combined Plan and Disclosure Statement in its entirety rather than to a particular portion of the Combined Plan and Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Combined Plan and Disclosure Statement; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (12) any effectuating provisions may be interpreted by the Liquidation Trustee in such a manner that is consistent with the overall purpose and intent of the Combined Plan and Disclosure Statement all without further notice to or action, order, or approval of the Bankruptcy Court or any

17

other Entity; (13) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (15) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided that corporate or limited liability company governance matters relating to the Debtors not incorporated in Delaware shall be governed by the laws of the state of incorporation or formulation of the applicable Debtor.

## E.    Reference to Monetary Figures

All references in the Combined Plan and Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## F.    Controlling Document

In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

**ARTICLE III**
**BACKGROUND AND DISCLOSURES**

## A.    The Debtors' Corporate History

In 2014, Impact Products and Safety Zone were standalone businesses, each specializing in providing certain safety and hygiene products and operating in different parts of the United States. Over the course of the next several years, both Impact Products and Safety Zone were acquired and combined with certain other strategic businesses under the "Supply Source Enterprises" name.

18

In the summer of 2020, a private equity fund acquired Supply Source and its subsidiaries in a carve-out transaction and has operated the Company as a standalone business since then.

## B.    The Debtors' Business Operations

As of the Petition Date, the Company provided comprehensive bundling of cleaning and safety products to its customers, with over 60% of its customers purchasing products across one or more of its primary four product categories.  The Debtors' products included personal protective equipment, cleaning and dusting supplies, dispensing equipment, floor care products, gloves, microfiber products, safety products, receptacles and material handling equipment, and washroom supplies.  Of the Debtors' total sales in fiscal year 2023, glove products made up approximately 47%, core cleaning products made up approximately 32%, safety products made up approximately 18%, and food service products (as well as other miscellaneous products) made up approximately 3%.  In addition to their sourcing and shipping services, the Debtors also offered their customers advanced customization capabilities such as hot stamping, pad printing, and silk-screen labeling services for unique design, logo, or package specifications.

Nearly all of the Debtors' inventory was sourced by purchasing directly from manufacturing vendors.  The Debtors created unique integrated sourcing capabilities by maintaining relationships with over 200 vendors throughout China, Indonesia, Sri Lanka, and the United States.  The substantial majority of the Debtors' vendors were based outside of the United States – mainly in China.  In fiscal year 2023, the Debtors purchased over 75% of their inventory from suppliers located outside of the United States.  The Debtors historically maintained strong relationships with their vendors, some of which relied upon the Debtors for a significant portion of their business and others who advanced costs for the Debtors in connection with producing the Debtors' inventory.

In China and Indonesia, the Debtors sourced their inventory through their Sourcing Partners who assisted the Debtors in identifying suitable vendors, inspecting the finished inventory, managing timely delivery of inventory to the Debtors, and handling most vendor communications on the Debtors' behalf.  The Debtors paid the Sourcing Partners either a fixed fee or a monthly commission based on vendor purchases.

Once sourced, the Debtors inspected and arranged shipment to several ports in the United States, including direct container shipments, where the Debtors' distribution centers were strategically coordinated to facilitate easy transportation.  The Debtors' distribution centers were located in Buena Park, California; Guilford, Connecticut; Houston, Texas; Richmond, Indiana; and Savannah, Georgia.  Two of the distribution centers were maintained by third-party logistics providers who arranged staffing for the distribution facilities.  The Debtors also maintained several warehouses throughout the United States to store their inventory.

The Debtors serviced a diversified customer base across multiple end markets.  Customers included distributors, such as retailers, buying groups, and wholesalers who depended on the Debtors for many of their sourcing needs as building international procurement capabilities in-house can be risky and challenging, making direct sourcing of all required SKUs not feasible in many instances, even for large corporations.  Relatedly, importing from Asia can be complex and is often accompanied by large expenses to ensure compliance with import practices and to ensure

19

quality of goods. Even certain large distributors with international capabilities utilized the Debtors' services for these reasons and relied on the Debtors for consistent and timely service.

## C. **The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors were obligors with respect to approximately $140 million in funded debt obligations, exclusive of payment-in-kind (or "PIK") interest. The following table summarizes the Debtors' prepetition capital structure (as of the Petition Date).

| Funded Debt | Approximate Amount Outstanding |
|---|---|
| Prepetition ABL Facility | $60 million *(plus PIK)* |
| Prepetition Term Loan Facility | $80 million *(plus PIK)* |

### 1. **The ABL Credit Agreement**

On June 30, 2020, the ABL Loan Parties entered into the Prepetition ABL Facility, pursuant to the ABL Credit Agreement, among the ABL Loan Parties, the ABL Agent, and the Prepetition ABL Lenders.

In connection with the ABL Credit Agreement, on June 30, 2020, the ABL Loan Parties and the ABL Secured Parties also entered into the ABL GCA.

Pursuant to the ABL Documents, the Debtors granted to the ABL Agent, for the benefit of itself and the other ABL Secured Parties, valid, binding, perfected, enforceable, first-priority liens and security interests in substantially all of the Debtors' property (as more fully detailed in the ABL Documents) wherever located, then owned or at any time thereafter acquired by or arising in favor of such ABL Loan Party or in which such ABL Loan Party now then had or acquired any right, title or interest (collectively, the "ABL Collateral").

On December 5, 2022, the ABL Loan Documents were amended to include the remaining Debtors as ABL Loan Parties.

As of the Petition Date, the Debtors were indebted and liable to the ABL Secured Parties in respect of the obligations under the ABL Documents in the aggregate principal amount of not less than $60 million plus all accrued but unpaid interest, penalties and fees thereon (including interest paid in kind and interest at the default rate, as applicable), fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith, including any "Obligations" as defined in the ABL Documents (such obligations under the ABL Documents, the "Prepetition ABL Obligations").

2.      **Term Loan Credit Agreement**

On June 30, 2020, the Term Loan Parties entered into the Prepetition Term Loan Facility, consisting of $85 million in initial term loans and $25 million in delayed draw term loan commitments, pursuant to the Term Loan Credit Agreement, dated as of June 30, 2020, among the Term Loan Parties, the Term Loan Agent, and the Term Loan Lenders.

In connection with the Term Loan Credit Agreement, the Term Loan Parties and the Term Loan Secured Parties also entered into the Term Loan GCA.

Pursuant to the Term Loan Documents, the Debtors granted to the Term Loan Agent, for the benefit of itself and the other Term Loan Secured Parties, valid, binding, perfected, enforceable, second-priority liens and security interests in substantially all of the Debtors' property (as more fully detailed in the Term Loan Documents) wherever located, then owned or at any time thereafter acquired by or arising in favor of such Term Loan party or in which such Term Loan Party now then had or acquired any right, title, or interest (collectively, the "Term Loan Collateral" and together with the ABL Collateral, the "Prepetition Collateral").

On December 5, 2022, the Term Loan Documents were amended to include the remaining Debtors as Term Loan Parties.

As of the Petition Date, the Debtors were indebted and liable to the Term Loan Secured Parties in respect of the obligations under the Term Loan Documents in the approximate aggregate principal amount of not less than $80 million plus all accrued but unpaid interest, penalties and fees thereon (including interest paid in kind, prepayment premiums, and interest at the default rate, as applicable), fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith, including any "Obligations" as defined in the Term Loan Documents (such obligations under the Term Loan Documents, the "Prepetition Term Loan Obligations" and together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations").

3.      **Intercreditor Agreement**

The priority of the security interests of the Term Loan Agent in the Term Loan Collateral and the ABL Agent in the ABL Collateral are governed by the Intercreditor Agreement.  Pursuant to the Intercreditor Agreement, under the circumstances, the priority of the security interests are as follows:

| Priority | Facility |
|---|---|
| First | Prepetition ABL Facility |
| Second | Prepetition Term Loan Facility |

4.      **Debt Purchase Transaction**

As further described below, on May 21, 2024, the Purchaser purchased the outstanding loans and commitments under the Prepetition ABL Facility and Prepetition Term Loan Facility.

11584845v.10

**D.    Circumstances Leading to These Chapter 11 Cases**

**1.    Challenges Facing the Debtors' Business**

Prior to 2020, the Debtors were consistently profitable with stable low single-digit growth prior to the COVID-19 pandemic.  In 2020, the Debtors experienced substantial growth due to the high demand for safety, hygiene, and sanitation products, as well as PPE – all of which the Debtors supplied.  The Debtors reported adjusted EBITDA of $93 million for 2020, nearly a 300% increase over the previous year.  However, in 2021 the Debtors' financial performance began to decline for several reasons.

Given the unprecedented global environment caused by COVID-19, the Debtors commissioned an industry demand study in early 2021.  The study concluded that the COVID-19 pandemic would fundamentally change the industry and market for the Debtors' products.  The study also estimated that the Debtors' COVID-related growth would likely be sustained through 2024.  In reliance on the study and in contemplation of continued customer demand at elevated prices, the Debtors increased purchases of inventory, even though the cost of such inventory was higher due to prevailing supply chain constraints during the pandemic.

At the same time as the Debtors were purchasing large quantities of inventory at elevated prices, they were also lacking certain key process controls that had not been properly implemented following the 2020 acquisition of the Debtors.  The lack of process controls resulted in the Debtors' sales teams placing orders for inventory with minimal management oversight and lack of control over inventory count or inventory pricing.  This led to significantly increased inventory counts, especially in niche product categories, that the sales teams were ultimately not able to sell to customers at profitable prices.

Contrary to the findings of the study commissioned by the Debtors, the effects of the COVID-19 pandemic on the market were short lived.  By the end of 2021, the demand for PPE had decreased to normal rates and, to make matters worse, some of the Debtors' regular customers were ordering at lower than normal rates due to, among other things, (a) work from home policies, which depleted the need for office building janitorial services and related products, (b) a rise in virtual schooling, which decreased the need for food services, janitorial services, and related products therewith, and (c) changes around daily hotel room cleaning, which reduced the need for related sanitation and cleaning products.

Accordingly, the Debtors were left with large amounts of excess inventory that they could no longer sell at the same quantities and for the same prices.  Although the Debtors regularly stored their inventory at their distribution centers during the normal course of their operations, the Debtors did not have adequate capacity to store the excess inventory they had at that time.  Thus, the Debtors were forced to enter into a number of agreements for additional storage space, substantially increasing the Debtors' storage costs relative to their normal course operations.

Excess inventory levels also caused significant issues with service quality and efficiency as the Debtors' warehouses were at capacity and warehouse employees struggled with servicing customers.  In the fall of 2023, the Debtors began to analyze and assess their distribution footprint with the aim of optimizing their distribution network.  The Debtors commissioned a study to

determine the appropriate strategy for the Debtors' distribution network.  The study suggested an organizational revamping of the Debtors' network including several distribution center closures and openings; the most significant of which was the transfer of warehousing operations from Toledo, Ohio to Richmond, Indiana.

The move from Toledo to Richmond ultimately created considerable challenges that intensified the Debtors' service disruption and inventory issues.  A confluence of factors contributed to the issues relating to the Richmond move.  First, prior management was unprepared for the move of their operations from Toledo to Richmond.  Inventory was moved without proper planning and controls, which resulted in product damage and poor inventory accuracy that led to significant costs to acquire four extra storage facilities, and disruption of services to customers.  Second, prior management failed to properly train staff on warehousing moving protocols which created safety and compliance issues.  Third, personnel and staffing constraints in the Richmond area created challenges for hiring and retaining suitable warehouse employees.

Taken together, these factors tightened the Debtors' liquidity.  2023 revenue declined over 26% from 2022 resulting in a negative 2023 EBITDA of $13 million, which further complicated the Debtors' relationship with their vendors and suppliers.

Additionally, due to the substantial operational and performance challenges discussed above, the Debtors' Prepetition ABL Lenders, who had provided the Debtors with up to $130 million of borrowing capacity in 2021, witnessed their asset coverage begin to decline substantially due to decreasing accounts receivable and significant inventory issues.  At the time of the Debt Purchase Transaction, the Prepetition ABL Facility was overdrawn by approximately $30 million.

In February 2024, the Prepetition ABL Lenders exercised cash dominion and began to sweep the Debtors' bank accounts, thereby requiring the Debtors to submit weekly borrowing requests to continue to operate the business.  Such borrowing requests were frequently reduced by the Prepetition ABL Lenders, which further exacerbated the Debtors' significant past due balances with their key trade vendors.  As a result of its deteriorating cash position, the Debtors fell behind on their accounts payable, resulting in an approximately 3% pricing loss in a commoditized market and put the Debtors' decades-long relationships with their key vendors at risk.

## 2.    The Debtors' Efforts to Address Business Challenges, the Prepetition Marketing Process, and Entry into the Stalking Horse APA

The Debtors took multiple steps to try to address their capital structure constraints, liquidity needs, and operational challenges before commencing these Chapter 11 Cases.  In the spring of 2023, the Debtors' owners hired a new management team with strong operational experience.  The new management team began to proactively formulate and implement certain Initiatives to improve performance.  These Initiatives included the implementation of inventory and purchasing improvements, customer segmentation and pricing policies, SKU rationalization, and simplified customer programs and rebates.  The implementation of these Initiatives resulted in year-over-year performance improvements, but ultimately the Debtors continued to face declining revenue and cash flow, as well as significant liquidity constraints exacerbated by their highly levered capital structure.  Due to the Debtors' increasingly tight liquidity resulting from the factors discussed above, their key vendors began requiring shortened payment terms, including pay on delivery and

11584845v.10

prepayment for inventory purchased by the Debtors.  This contributed to additional pressure on liquidity and inventory levels that the Debtors could not sustain.

Without access to incremental liquidity, the Debtors' outstanding vendor payments continued to increase significantly with vendors beginning to threaten legal recourse and other actions if payments for severely past due accounts payable were not received.  Given the Debtors' operational challenges and highly levered capital structure, their existing stakeholders were not willing to invest additional capital into the business.  Further, the rapid depletion of the borrowing base under the Prepetition ABL Facility severely limited the Debtors' ability to raise incremental liquidity through any third-party financing source.

Despite management's best efforts, the significant impact of growing vendor and supplier issues coupled with the Debtors' constrained liquidity, made it apparent that the Debtors would not be able to sustain its outstanding debt on a long-term basis and maintain the liquidity necessary to operate their business and maximize long-term enterprise value.

Given the urgent need for incremental liquidity to stabilize the business to protect the jobs of employees and their decades-long customer and vendor relationships, the Debtors began to explore potential strategic alternatives.  To that end, March 5, 2024, the board of non-Debtor SSE Parent formed a Special Committee composed of the Independent Director to evaluate strategic alternatives or transactions that may have been available to the Debtors and may have presented conflicts of interest with the Debtors' debt and equity holders.  The Special Committee was vested with sole authority to negotiate and recommend the terms, structure, and means of implementation of any matter in which a conflict may have existed between the Debtors and its equity holder.

Beginning in early February 2024, Portage Point began the Marketing Process.  As part of the Marketing Process, Portage Point, on behalf of the Debtors, contacted over 70 potential investors, including strategic and financial investors, to solicit proposals to acquire the Debtors' business or assets on a cash-free, debt-free basis.

At the same time, the Company and its advisors continued discussions with the Prepetition ABL Lenders to gauge their willingness to fund the Company to the completion of a sale transaction through chapter 11.  Through these negotiations, the Prepetition ABL Lenders communicated their (a) strong desire to have their existing indebtedness purchased by any stalking horse buyer prior to the commencement of any chapter 11 cases; (b) unwillingness to consent to a priming debtor in possession facility by any other third party in a chapter 11 case; and (c) unwillingness to provide the Debtors with a debtor in possession financing proposal.

Accordingly, the Debtors' prepetition Marketing Process culminated in the negotiation of and entry into the Stalking Horse APA.  In connection with the Stalking Horse APA, and prior to the Petition Date, the Purchaser purchased the Prepetition ABL Facility and Prepetition Term Loan Facility (also referred to herein as the Debt Purchase Transaction), at the insistence of the then Prepetition ABL Lenders, and agreed to the funding of the DIP Financing to fund these Chapter 11 Cases, the closing of the Sale, and wind down expenses.

The Stalking Horse APA was the product of arm's-length, good-faith negotiations among the Debtors and the Stalking Horse Bidder and represented the highest or otherwise best offer the

Debtors had received.  The negotiation of the Stalking Horse APA on behalf of the Debtors was led by the Debtors' management and advisors under the oversight of the Special Committee.

### E.    The Chapter 11 Cases

#### 1.    First Day Relief

On the Petition Date, the Debtors filed the First Day Motions.  The First Day Motions requested relief from the Bankruptcy Court to, among other things: (a) jointly administer the Chapter 11 Cases; (b) appoint the Notice, Claims, and Solicitation Agent; (c) pay employee wages; (d) maintain the Debtors' cash management system; (e) pay taxes; (f) pay insurance obligations; (g) maintain utilities; (h) obtain postpetition financing (discussed in further detail below); (i) pay critical vendors; and (j) maintain customer programs.  In support of the First Day Motions, the Debtors relied upon the First Day Declaration.  The First Day Motions were all approved on an interim and/or final basis, as applicable.

#### 2.    DIP Financing

On May 22, 2024, the Debtors filed the DIP Financing Motion.  Pursuant to the DIP Financing Motion, the Debtors sought, among other things, authorization and approval of the DIP Financing from the DIP Lender, with up to $20 million in new money borrowing capacity.  The Debtors entered these Chapter 11 Cases with minimal cash on hand, and thus access to the DIP Financing and the use of cash collateral was critical to ensure the Debtors' smooth entry into chapter 11.  The DIP Financing was market-tested and evaluated by the Debtors and their Professionals and included the roll-up of $40 million of obligations under the Prepetition ABL Facility into the DIP Financing.  The Bankruptcy Court entered the Interim DIP Order on May 23, 2024 [Docket No. 49] and the Final DIP Order on June 24, 2024 [Docket No. 184], in each case approving the DIP Financing Motion.

As part of the Committee Settlement, pursuant to the terms of the Final DIP Order, upon the Closing Date, the DIP Lender and the Prepetition Secured Parties forever and irrevocably waived any rights to receive a distribution on account of any and all claims that such parties may have had against the Debtors and the Debtors' Estates, including from the Additional Excluded Cash.  Pursuant to the terms of the Release Letter executed on the Closing Date, the DIP Obligations have been fully satisfied and, thus, the Combined Plan and Disclosure Statement does not classify the Claims relating to the DIP Obligations arising under the DIP Financing.

#### 3.    Retention of Professional Advisors

In May 2024, the Debtors filed the Debtor Retention Applications, including:

- Potter Anderson & Corroon LLP, as legal counsel [Docket No. 62];

- McDermott Will & Emery LLP, as legal counsel [Docket No. 63];

- Kurtzman Carson Consultants LLC (d/b/a to Verita Global) as claims and noticing agent [Docket No. 4] and administrative advisor [Docket No. 64]; and

11584845v.10

- Portage Point, to provide a Chief Restructuring Officer and other personnel [Docket No. 66].

The Debtor Retention Applications were approved and orders were entered authorizing the Debtor Retention Applications on June 13 and 14, 2024 as applicable. The foregoing Professionals are, in part, responsible for the administration of these Chapter 11 Cases. The postpetition compensation of all of the Debtors' Professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### 4. Appointment of the Committee

On June 3, 2024, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 82], notifying parties in interest that the U.S. Trustee had appointed the Committee in these Chapter 11 Cases, which members consist of: (a) Jiangsu Bytech Medical Supplies Co., Ltd.; (b) Xiantao Crosscare Protective Products Co., Ltd.; (c) Xiantao Deming Healthcare Products Ltd.; (d) Hiten Nonwoven Healthcare Products (Hubei) Ltd.; and (e) Xiantao Yilin Protective Products Co., Ltd. The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on June 20, which was then continued to July 2, 2024.

In June 2024, the Committee filed the Committee Retention Applications, including:

- Orrick, Herrington & Sutcliffe LLP, as legal counsel [Docket No. 189];

- Klehr Harrison Harvey Branzburg LLP, as legal counsel [Docket No. 190];

- Tian Yuan Law Firm, as legal counsel [Docket No. 191];

- Foresight Restructuring LLC, as financial advisor [Docket No. 193]; and

- Dundon Advisers LLC, as financial advisor [Docket No. 196].

The Committee Retention Applications were approved, and orders were entered authorizing the Committee Retention Applications on July 22, 2024. The postpetition compensation of all of the Committee Professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### 5. Schedules and Statements of Financial Affairs

On June 18, 2024, the Debtors filed their respective Schedules and Statements [Docket Nos. 156 – 165].

### 6. Bar Date

On July 8, 2024, the Bankruptcy Court entered the Bar Date Order. The Bar Date Order established the General Bar Date, the Governmental Bar Date, and an administrative claim bar date for Administrative Claims arising from the Petition Date through and including July 26, 2024. A copy of the *Notice of Deadline for Filing Proofs of Claim and Requests for Allowance of Administrative Claims* can be found at Docket No. 274.

Pursuant to the Bar Date Order, all Creditors holding or wishing to assert a Claim against the Debtors or the Debtors' Estates, accruing prior to the Petition Date, and which remain unpaid, including Claims arising under Bankruptcy Code section 503(b)(9), were required to file a Proof of Claim by August 12, 2024 at 5:00 p.m. (prevailing Eastern Time), or the General Bar Date.

In addition, pursuant to the Bar Date Order, all Creditors holding or wishing to assert Administrative Claims against the Debtors or their Estates, accruing from the Petition Date through and including July 26, 2024, were required to file such Claims by August 30, 2024 at 5:00 p.m. (prevailing Eastern Time). Administrative Claims arising from July 27, 2024 through the Effective Date of the Combined Plan and Disclosure Statement are governed by the Administrative Claim Bar Date set forth herein.

### 7.      Ordinary Course Professionals

On May 28, 2024, the Debtors filed a motion [Docket No. 65] seeking entry of an order establishing the orderly and regular process for: (a) the retention of Ordinary Course Professionals including accountants, attorneys, and other Professionals on an "as needed" basis without the submission of separate, formal retention applications; and (b) for the allowance and payment of compensation and reimbursement of expenses for such Ordinary Course Professionals. On June 13, 2024, the Bankruptcy Court entered the OCP Order [Docket No. 125].

### 8.      Rejection Motions

In efforts to start effectuating a wind down after the Sale and to prevent administrative expenses from accruing in these Chapter 11 Cases, the Debtors, through various motions which were subsequently approved by the Bankruptcy Court, have successfully rejected certain Executory Contracts and most of their real property Unexpired Leases and vacated those related premises that were not assumed and assigned as part of the Sale process. *See* Docket Nos. 8, 79, 105, 128, 199, 227 & 277.

### 9.      The KERP Motion

On May 30, 2024, the Debtors filed a motion [Docket No. 77] seeking entry of an order authorizing the Debtors to assume certain employee retention agreements and approving a key employee retention plan for certain non-insider employees. On June 18, 2024, the Bankruptcy Court entered the KERP Order [Docket No. 154].

### 10.      The Sale

Shortly after the Petition Date, the Debtors filed the Bidding Procedures and Sale Motion seeking to sell substantially all of the Debtors' assets to the Purchaser. The Bankruptcy Court subsequently entered the Bidding Procedures Order on June 20, 2024, whereby the Bankruptcy Court authorized

27

the Debtors to, among other things, enter into the Stalking Horse APA with the Purchaser for the sale of substantially all of the Debtors' assets.

Because the Debtors did not receive any qualified competing written offers the Stalking Horse APA was deemed the successful bid. *See* Docket No. 185.

On July 10, 2024, the Bankruptcy Court entered the Sale Order [Docket No. 222] approving the Sale pursuant to the Stalking Horse APA. The Sale closed on July 19, 2024. *See* Docket No. 257.

Pursuant to the Stalking Horse APA, the Purchaser purchased substantially all of the Debtors' assets including all Avoidance Actions, with the exception of certain Avoidance Actions against certain of the Excluded Vendors, set forth in schedule 2.2(n) of the Stalking Horse APA, and all of the rights, claims or Causes of Action of the Debtors of any kind, including those available under the Bankruptcy Code, against any officer, director, employee, manager or Affiliate of, or lender to, any of the Debtors or any of their respective Affiliates (and the proceeds of any Insurance Policies related to any such rights, claims, or causes of action) arising at any time prior to the Closing Date. Pursuant to the Stalking Horse APA, such Avoidance Actions, rights, claims, and Causes of Action, were waived and released in full immediately upon Closing.

Upon the Closing Date and pursuant to that certain "Release Letter," dated as of July 19, 2024, the Debtors' DIP Obligations were deemed fully satisfied with the exception of any of the DIP Lender's rights that expressly survived the repayment and satisfaction of the DIP Obligations.

## F.    **The Committee Settlement**

Pursuant to the Final DIP Order, and as more fully described therein, the Debtors, the Committee, the Prepetition Secured Parties, the DIP Lender, and HIG reached a settlement (referred to herein as the Committee Settlement) whereby:

- The Committee agreed to support and not object to the Sale, the consummation of the Sale, and entry of the Sale Order, including the purchase of the Debtors' claims and causes of action and the waiver and release of such claims and causes of action by the Purchaser, as set forth in section 2.1(c) of the Stalking Horse APA;

- subject to consummation of the Sale and the Committee not initiating a Challenge or filing a Standing Motion (both as defined in the Final Sale Order),

  - (i) the Purchaser and the Debtors agreed to include an additional line item titled "Additional Excluded Cash" in the amount of $1,350,000 in the Wind Down Budget;

  - (ii) the DIP Lender and the Prepetition Secured Parties agreed to forever and irrevocably waive any rights to receive a distribution on account of any and all claims that such parties may have against the Debtors and the Debtors' Estates, including from the Additional Excluded Cash;

  - (iii) HIG agreed to forever and irrevocably waive any and all claims against the Debtors, the Debtors' Estates, and the Purchaser Released Persons; and

- the Purchaser and the Debtors agreed to increase the amount allocated for Committee Professionals in their budget to $1,000,000.

Additionally, subject to the Committee not initiating a Challenge or filing a Standing Motion (each as defined in the Final DIP Order) the parties agreed to amend the Stalking Horse APA to provide the following:

- fifty-percent (50%) of Excess Cash is an "Excluded Asset" under the Stalking Horse APA; *provided, however,* that no more than $600,000 of Excess Cash shall be an Excluded Asset;

- as provided in the Stalking Horse APA, the Purchaser will work in good faith with those vendors to be set forth in a schedule to the Stalking Horse APA to create an agreement with those vendors that will provide assurances that the Purchaser will actively engage with them to create a structure to assure that the Purchaser's supply chain has minimal disruptions;

- the following claims and causes of action shall be "Excluded Assets" under the Stalking Horse APA: (a) Avoidance Actions against the Excluded Vendors, and (b) any other causes of action (including commercial tort claims) against the Excluded Vendors; and

- in the event that the Debtors, on the Closing Date, have insufficient cash on hand or remaining availability under the DIP Financing to fund the Additional Excluded Cash, the Purchase Price (as defined in the Stalking Horse APA) shall be increased by the amount necessary to fund the shortfall (the "<u>Shortfall Amount</u>"); *provided, however*, that in no event shall the Shortfall Amount exceed $545,000. The Shortfall Amount, if any, shall be paid by the Purchaser in cash on the Closing Date. The Shortfall Amount was not required to be paid at Closing.

Finally, the parties agreed that this Combined Plan and Disclosure Statement would provide for (a) customary releases and exculpations of the Debtors, Committee Professionals, and the members of the Committee, solely in their capacity as such and (b) mutual releases and waiver of claims by and among the Debtors, their Estates and Creditors, the Committee, and HIG.

As set forth above, the Committee Settlement included an agreement by and among the Debtors, the Committee, and HIG, whereby HIG would forever and irrevocably waive the HIG Claims in exchange for mutual releases by and among the Debtors, their estates and creditors, the Committee, and HIG. This Plan constitutes a motion seeking Court approval of the settlement of these matters pursuant to Bankruptcy Rule 9019. The HIG Claims include unpaid claims under HIG's management services agreement with the Debtors and potential claims for indemnity and contribution from the Debtors. The HIG Claims would significantly and materially reduce recoveries to General Unsecured Claims if they were to become Allowed. Litigating whether the HIG Claims are Allowed would be timely and expensive and the outcome would be uncertain. As a result, the Debtors and Committee submit that resolving the HIG Claims pursuant to the terms for the Plan are in the best interests of the Debtors' Estates and constitute a valid exercise of the Debtors' business judgment.

Confirmation of this Plan would effectuate the Committee Settlement and give full force and effect to the foregoing releases, waivers, and agreements, and the Confirmation Order shall so provide.

## ARTICLE IV

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article V.

### A.    Administrative Claims

Except to the extent that a Holder of an Allowed Administrative Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment with respect to such Allowed Administrative Claim, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim becomes due or as soon as reasonably practicable thereafter; (b) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim becomes due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or Liquidation Trustee, as applicable; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided that* any Allowed Administrative Claim that has been assumed by the Purchaser under the Stalking Horse APA shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan.

Administrative Claims incurred or arising on or prior to July 26, 2024 are governed by the Bar Date Order and the administrative claim bar date set therein.

Requests for payment of Administrative Claims arising after July 26, 2024 through the Effective Date must be Filed on or before the Administrative Claim Bar Date.  Any such Administrative Claim must be filed with the Bankruptcy Court with a copy served on Debtors' counsel (prior to the Effective Date) and the Liquidation Trustee and its counsel (after the Effective Date), as applicable, by regular mail, overnight courier, or hand delivery to the Claims and Noticing Agent at the following addresses by the Administrative Claim Bar Date:

> (by mail, overnight mail, courier, or hand delivery)
> Supply Source Claims Processing Center
> c/o KCC dba Verita
> 222 N. Pacific Coast Highway, Suite 300
> El Segundo, CA 90245

Except as otherwise ordered by the Court, holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such applicable date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims

against the Debtors or its property and such Administrative Claims shall be deemed released against the Debtors, their Estates, or the Liquidation Trustee, as of the Effective Date. Unless the Debtors or the Liquidation Trustee (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Debtors or the Liquidation Trustee object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be Allowed and, if so, in what amount.

## B.   Professional Fee Claims

### 1.   Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 30 days after the Effective Date unless no final request for payment of such Professional Fee Claims is required pursuant to an order of the Bankruptcy Court. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Debtors or the Liquidation Trustee (as applicable) shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash, or receive such other treatment as may be agreed upon by a Holder of any such Allowed Professional Fee Claim, the Debtors or the Liquidation Trustee, as applicable, to such Professionals, on the later of (i) the Effective Date, or as soon as reasonably practicable thereafter, and (ii) the date such Professional Fee Claim becomes an Allowed Claim by a final order of the Bankruptcy Court or as soon as reasonably practicable thereafter, to be paid in the full allowed amount in cash (as determined by agreement, settlement, or order of the Bankruptcy Court),

### 2.   Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish (if not previously established) and fund the Professional Fee Escrow Account with Cash such that the aggregate amount of Cash in the Professional Fee Escrow Account on the Effective Date equals the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Liquidation Trust.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Liquidation Trust, as applicable, from the funds held in the Professional Fee Escrow Account; *provided that* the Debtors' and the Liquidation Trust's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or

more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account (the "Remaining Professional Fee Escrow Amounts") (i) shall promptly be transferred to the Liquidation Trust's account, (ii) shall thereupon constitute Liquidation Trust Assets, and (iii) shall be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court.

**3.      Professional Fee Escrow Amount**

The Professionals shall provide a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five Business Days before the anticipated Effective Date; *provided that* such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professionals' final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, provided that the Liquidation Trustee shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

**C.      Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors, or the Liquidation Trustee, as applicable, agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, either (i) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (ii) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date, in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); *provided, that* any Allowed Priority Tax Claim that has been expressly assumed by the Purchaser under the Stalking Horse APA shall not be an obligation of the Debtors.

Once an Allowed Priority Tax Claim has been paid in full, any liens securing such Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

**D.      Statutory Fees and Related Reporting Obligations**

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent

applicable ("Statutory Fees") prior to the Effective Date shall be paid by the Debtors when due or on the Effective Date, or as soon thereafter as practicable. After the Effective Date, the Liquidation Trust shall pay any and all Statutory Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Liquidation Trustee shall file with the Bankruptcy Court one UST Form 11-PCR report when it becomes due reflecting payments made by the Liquidation Trust. Notwithstanding the substantive consolidation of the Debtors called for in the Plan, each and every one of the Debtors (until such Debtor's Chapter 11 Case is dismissed) and the Liquidation Trust shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the entry of an order by the Bankruptcy Court that closes, dismisses, or converts to a case under Chapter 7 of the Bankruptcy Code for each of the Chapter 11 Cases of the Debtors; *provided, that* the Debtors shall not pay Statutory Fees to the Office of the U.S. Trustee on account of the contribution of the Liquidation Trust Assets to the Liquidation Trust on the Effective Date.

## ARTICLE V
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.     Classification of Claims and Interests

Except for the Claims addressed in Article IV of the Combined Plan and Disclosure Statement, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article V for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan shall apply as a substantively consolidated Plan for all of the Debtors. All of the potential Classes for the Debtors are set forth herein.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distributions received by Holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Plan and Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

| Class | Claim/Interest | Estimated Allowed Amount of Claims[5] | Status | Voting Rights | Projected Recovery[6] |
|---|---|---|---|---|---|
| 1 | Miscellaneous Secured Claims | $[] | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 2 | Other Priority Claims | $[] | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 3 | General Unsecured Claims | $[] - $[] | Impaired | Entitled to Vote | 0-100% |
| 4 | Subordinated Claims | $0.00 | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| 5 | Existing Equity | $[] | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

## B.     Treatment of Claims and Interests

Subject to Article XI hereof, each Holder of an Allowed Claim against or Allowed Interest in the Debtors, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors, or the Liquidation Trustee, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

     1.     Class 1 – Miscellaneous Secured Claims

       (a)     *Classification:* Class 1 consists of all Miscellaneous Secured Claims.

       (b)     *Treatment:* Each Holder of an Allowed Class 1 Miscellaneous Secured Claim shall receive, either (i) such other treatment as may be agreed upon

---

[5] These amounts represent estimated Allowed Claims against the Debtors and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise.  The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and all objections to such Claims have not been filed and/or fully litigated and may continue following the Effective Date.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[6] The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims against the Debtors in the Chapter 11 Cases.  As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated.  Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court and the actual amount of cash available for Distribution.

by any such Holder of a Miscellaneous Secured Claim and either (A) the Debtors, prior to the Effective Date, or (B) Liquidation Trustee, after the Effective Date; or (ii) at the Debtors' option: (A) payment in full in Cash of the Allowed amount of such Miscellaneous Secured Claim (as determined by settlement or Final Order of the Bankruptcy Court), (B) the collateral securing its Allowed Miscellaneous Secured Claim, or (C) such other treatment that would render such Miscellaneous Secured Claim Unimpaired.

(c)     *Voting:* Class 1 is Unimpaired under the Plan.  Holders of Miscellaneous Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.     Class 2 – Other Priority Claims

(a)     *Classification:* Class 2 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claims and either (i) the Debtors, prior to the Effective Date, or (ii) Liquidation Trustee, after the Effective Date agree to less favorable treatment for such Holder, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of the Allowed amount of such Claim (as determined by settlement or Final Order of the Bankruptcy Court) on the Effective Date, or as soon as reasonably practicable, or such other treatment rendering such Claim Unimpaired.

(c)     *Voting:* Class 2 is Unimpaired under the Plan.  Holders of Other Priority Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.     Class 3 – General Unsecured Claims

(a)     *Classification*: Class 3 consists of all General Unsecured Claims.

(b)     *Treatment*: Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of the GUC Recovery.

(c)     *Deficiency Claims*: Pursuant to the Committee Settlement, upon the Closing Date, each Holder of a Prepetition Secured Party Deficiency Claim waived the right to receive any Distribution on account of its Prepetition Secured Party Deficiency Claim.

(d)     *Voting*: Class 3 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

11584845v.10

4.      Class 4 – Subordinated Claims

(a)     *Classification*: Class 4 consists of all Subordinated Claims.

(b)     *Treatment*: On the Effective Date, all Subordinated Claims shall be cancelled, released, and discharged as of the Effective Date, and shall be of no further force or effect.  Therefore, Holders of Subordinated Claims shall not receive any Distribution on account of such Subordinated Claims.

(c)     *Voting*: Class 4 is Impaired under the Plan.  Holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5.      Class 5 – Existing Equity

(a)     *Classification:* Class 5 consists of all Existing Equity.

(b)     *Treatment:* On the Effective Date, Existing Equity of the Debtors shall be cancelled, and the Holders of Existing Equity Interests shall receive no Distribution under the Plan.

(c)     *Voting:* Class 5 is Impaired under the Plan.  Holders of Existing Equity are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## C.      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.   Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

## D.      **Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Liquidation Trustee reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**E.**    **Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**F.**    **Nonconsensual Confirmation**

Bankruptcy Code section 1129(a)(10) shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XVI of the Plan to the extent, if any, that Confirmation pursuant to section Bankruptcy Code section 1129(b) requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**G.**    **Acceptance or Rejection of the Plan**

   **1.**    **Voting Classes**

Class 3 is entitled to vote on the Plan.

   **2.**    **Presumed Acceptance of the Plan**

Pursuant to the Bankruptcy Code, Classes 1 and 2 are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

   **3.**    **Presumed Rejection of the Plan**

Pursuant to the Bankruptcy Code, Classes 4 and 5 are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**H.**    **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court may, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**I.**    **No Waiver**

Nothing contained in this Plan shall be construed to waive the Debtors' or Liquidation Trustee's right to object on any basis to any Claim, including after the Effective Date.

## ARTICLE VI
## CONFIRMATION AND VOTING PROCEDURES

### A.    Confirmation Procedures

The Disclosure Statement Order, among other things, will conditionally approve the Combined Plan and Disclosure Statement for solicitation purposes only and authorize the Debtors to solicit votes to accept or reject the Plan.  The Confirmation Hearing will be scheduled for _____ __, **2024** at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom #1, Wilmington, Delaware 19801 to consider (i) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

### B.    Procedure for Objections

Any objection to interim approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code or final approval of the Disclosure Statement and confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (i) co-counsel to the Debtors, McDermott Will & Emery LLP, 444 West Lake Street, Chicago, IL 60606, Attn: Felicia Gerber Perlman (fperlman@mwe.com), Bradley Thomas Giordano (bgiordano@mwe.com), and Carole M. Wurzelbacher (cwurzelbacher@mwe.com) and Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Floor, Wilmington, DE 19801, Attn: M. Blake    Cleary    (bcleary@potteranderson.com),    R.    Stephen    McNeill (rmcneill@potteranderson.com), and Katelin A. Morales (kmorales@potteranderson.com); (ii) Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox    35,    Wilmington,    DE    19801,    Attn:    Benjamin    A.    Hackman (Benjamin.a.hackman@usdoj.gov) and Malcolm M. Bates (Malcolm.m.bates@usdoj.gov); and (iii) co-counsel to the Committee, Orrick, Herrington & Sutclifee LLP, 51 West 52nd Street, New York, NY 10019, Attn: Mark Franke (mfranke@orrick.com) and Brandon Batzel (bbatzel@orrick.com) and Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, DE 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com) and Richard M. Beck (rbeck@klehr.com) (collectively, the "Objection Recipients"); in each case, by no later than (a) _____ __, **2024 at 4:00 p.m. (ET)** in connection with interim approval of the Disclosure Statement and (b) _____ __, **2024 at 4:00 p.m. (ET)** in connection with final approval of the Disclosure Statement and confirmation of the Plan.  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### C.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all of the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that: (x) the Plan has classified Claims and

Interests in a permissible manner; (y) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (z) the Plan has been proposed in good faith.

## D.    Classification of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).  The Debtors are also required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that the Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

## E.    Impaired Claims or Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are altered under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Class 3 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 4 and 5 are Impaired and will not receive

or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. YOU MAY ALSO SUBMIT A BALLOT THROUGH THE NOTICE, CLAIMS, AND SOLICITATION AGENT'S ONLINE ELECTRONIC BALLOT UPLOAD PORTAL LOCATED AT HTTPS://WWW.VERITAGLOBAL.NET/SUPPLYSOURCE AND CLICKING ON THE "SUBMIT ELECTRONIC BALLOT (eBALLOT)" SECTION OF THE WEBSITE. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE NOTICE, CLAIMS, AND SOLICITATION AGENT AT:

Supply Source Ballot Processing Center
c/o KCC dba Verita
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

or

https://www.veritaglobal.net/supplysource/inquiry

or

(866) 927-7078 (U.S./Canada) or (310) 751-2651 (International)

THE NOTICE, CLAIMS, AND SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE. IF YOU BELIEVE YOU REQUIRE LEGAL ADVICE, YOU SHOULD CONSULT WITH YOUR ATTORNEY.

## F.    Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. The Debtors shall seek Confirmation of the Plan

pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that votes or is deemed to reject the Plan, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

The Debtors believe that the requirements of section 1129(b) of the Bankruptcy Code are satisfied. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists.  At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without sufficient justifications for doing so.  The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, except where there is sufficient justification for different treatment.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."  To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

<u>Secured Creditors</u>.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value at least equal to the amount of its allowed secured claim as of the Effective Date, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

<u>Unsecured Creditors</u>.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value as of the Effective Date equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan on account of such junior claim or interest.

<u>Equity Interests</u>.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the Allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to such non-accepting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

## G.    <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).

For purposes of this test, the Debtors have analyzed the ability of the Debtors and the Liquidation Trust to meet their obligations under the Plan. Based on the Debtors' analysis, the Debtors and the Liquidation Trust will have sufficient assets to accomplish their tasks under the Plan. Therefore, the Debtors believe that the transactions to be effectuated pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

## H. <u>Best Interests Test and Liquidation Analysis</u>

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Here, the Debtors believe, and a liquidation analysis will show that, the Combined Plan and Disclosure Statement satisfies the best interests test as the recoveries expected to be available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement will be greater than the recoveries expected in a liquidation under chapter 7 of the Bankruptcy Code.

The Purchased Assets have already been sold to the Purchaser under the Sale Order, and the Debtors have limited Assets remaining in their Estates. While a liquidation under chapter 7 of the Bankruptcy Code would have the same goal, the Debtors believe that the Combined Plan and Disclosure Statement provides the best source of recovery for several reasons. First, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would not provide for a timely distribution. Second, the Debtors believe distributions would likely be smaller because a chapter 7 trustee and his/her Professionals would have to expend significant time and resources familiarizing themselves with the history of the Debtors, the Retained Causes of Action, and any other Cause of Action prior to pursuing any of such.

Under the Combined Plan and Disclosure Statement, the Liquidation Trust Expenses, including the fees of the Liquidation Trustee and fees for the Liquidation Trustee's Professionals, will be paid out of the Liquidation Trust Assets prior to any Distribution being made to creditors.

At this time, there are no alternative plans available to the Debtors. The closing of the Sale has already occurred, and the Debtors are no longer a going concern enterprise and have few Assets remaining, if any, to administer. Therefore, the Debtors believe that the Combined Plan and Disclosure Statement provides the greatest possible value to all stakeholders under the circumstances, and has the greatest chance to be confirmed and consummated.

## ARTICLE VII
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Restructuring Transactions

On the Effective Date, or as soon as reasonably practicable thereafter, the Liquidation Trustee shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions"). The actions to implement the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

### B.    Sources of Consideration for Plan Distributions

Payments required to be made under the Plan shall be funded from (i) Cash held by the Debtors as of the Effective Date, including Excluded Excess Cash, Additional Excluded Cash, and Remaining Professional Fee Escrow Amounts, if any; and (ii) net proceeds of Retained Causes of Action.

To the extent not paid in full in cash on the Effective Date, and as necessary, reserves for payment of claims not yet allowed and for Disputed Claims may be funded on the Effective Date, or as soon thereafter as is practicable, and, in the case of the Professional Fee Claims, held in the Professional Fee Escrow Account until such claims are approved, and authorized to be paid, by the Court.

### C.    The Liquidation Trust

On or prior to the Effective Date, the Debtors, on their own behalf and on behalf of Holders of the Beneficiaries, will execute the Liquidation Trust Agreement and will take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement as further described in Article XI hereof. On the Effective Date (or, with respect to the Remaining Professional Fee

Escrow Amounts, on the Escrow Amounts Transfer Date) or as soon thereafter as is practicable, and in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Liquidation Trust all of their rights, title, and interests in all of the Liquidation Trust Assets.

Nothing in the Plan shall constitute a waiver of any privilege claims over any of the documents, including any privileged documents, that are produced to or received by the Liquidation Trust or Liquidation Trustee. For the avoidance of doubt, the Liquidation Trust is a successor-in-interest to the Debtors, and thus, the transfer of any privileged documents as provided herein does not impair or waive any privilege.

## D.    Cancellation of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under the DIP Documents and the Prepetition Credit Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest shall be cancelled solely as to the Debtors and the Liquidation Trustee shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors shall be released. Notwithstanding the foregoing, no Executory Contract or Unexpired Lease that (i) has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

## E.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (i) implementation of the Restructuring Transactions; and (ii) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors, and any corporate action required by the Debtors or the Liquidation Trustee in connection with the Plan or corporate structure of the Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, members, or officers of the Debtors or the Liquidation Trustee. Before, on, or after the Effective Date, the appropriate officers, security holders, directors, and managers of the Debtors or the Liquidation Trustee, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors. The authorizations and approvals contemplated by this Article VII.E shall be effective notwithstanding any requirements under non-bankruptcy law.

**F.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the Liquidation Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Transactions in the name of and on behalf of the Debtors after the Effective Date, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**G.      Section 1146 Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property under or in connection with the Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Liquidation Trust; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; or (v) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, transfer tax, conveyance fee, intangibles or similar tax, sales tax, use tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**H.      Preservation of Retained Causes of Action**

The Debtors reserve and, as of the Effective Date, assign to the Liquidation Trust the Retained Causes of Action and the Liquidation Trustee's rights to commence, prosecute, or settle such Causes of Action on behalf of and for the benefit of the Holders of Class 3 General Unsecured Claims shall be preserved notwithstanding the occurrence of the Effective Date.  **No Entity may rely on the absence of a specific reference in this Combined Plan and Disclosure Statement or the Plan Supplement to any Cause of Action against it as any indication that the Debtors or the Liquidation Trustee, as applicable, will not pursue any and all available Retained Causes of Action against it.  The Debtors or the Liquidation Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article XIV of the Plan.**  The Liquidation Trustee expressly reserves all Retained Causes of Action for later adjudication, and, therefore, no

45

preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of the Plan.

The Liquidation Trustee reserves and shall retain such Retained Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Liquidation Trust.  The Liquidation Trustee shall retain and may exclusively enforce any and all such Causes of Action.  The Liquidation Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**I.    Health and Benefit Plans of the Debtors and Post-Effective Date Debtors**

Unless otherwise assumed by the Purchaser pursuant to the Stalking Horse APA or transferred to other Entities participating in such plans, any health and/or benefit plans, including any 401(k) plans, of the Debtors existing as of the Effective Date, including all such plans pursuant to which any Debtor is an administrator or in which current or former employees of any Debtor participate, shall be terminated by the Liquidation Trustee in accordance with applicable law.  As a result of such termination, any employees of a non-Debtor Entity participating in such plans may no longer have a plan in which to participate.

**J.    Closing the Chapter 11 Cases**

After the Effective Date, the Liquidation Trustee may file a motion to close the Chapter 11 Cases of each of the Debtors for all purposes.  For the avoidance of doubt, the closing of such cases shall not have any effect, in any manner, on the Retained Causes of Action that the Liquidation Trustee may assert in accordance with the Plan and the Liquidation Trust Agreement.  The case of Impact Products, LLC, identified as Case No. 24-11055 (the "Remaining Case") shall remain open and subject to the provisions of this Article VII.J.  Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Remaining Case, when all assets contributed to the Liquidation Trust have been liquidated and converted into Cash (other than those assets abandoned by the Liquidation Trust), and such Cash has been distributed in accordance with the Liquidation Trust Agreement and this Plan, the Liquidation Trust may seek authority from the Bankruptcy Court to close the Remaining Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**K.    U.S. Securities and Exchange Commission**

Notwithstanding any language to the contrary contained in this Combined Plan and Disclosure Statement and/or the Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the SEC from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or

delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-Debtor person or entity in any forum.

## ARTICLE VIII
## SUBSTANTIVE CONSOLIDATION

The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating all of the Estates of all of the Debtors into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan.

The United States Court of Appeals for the Third Circuit set forth the touchstones for substantive consolidation in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). In that case, the Third Circuit set forth the following:

> [W]hat must be proven [] concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id.* at 211. The Third Circuit went on to note that debtors' assets are "hopelessly commingled" when there a number of entities that are operating conjointly whose record keeping is too inadequate to accurately account for and keep separate affairs of the various entities. *Id.* at 211, n.20.

The Debtors believe that they meet the standard under *Owens Corning* and, thus, the Estates of all of the Debtors should be deemed substantively consolidated.

As noted above and in the First Day Declaration, in 2014, Debtors Impact Products and Safety Zone were standalone businesses, each specializing in providing certain safety and hygiene products and operating in different parts of the United States. Over the course of the next several years, both Impact Products and Safety Zone were acquired and combined with certain other strategic businesses under the "Supply Source Enterprises" name. In the summer of 2020, a private equity fund acquired Supply Source and its subsidiaries in a carve-out transaction and has operated the Company as a single business since then. As part of this acquisition and in an effort to create one consolidated and fully integrated business, all books and records and record keeping obligations were transferred to Debtor Impact Products in the spring of 2022. Accordingly, since 2022 (prior to the Petition Date) and as of the Petition Date, the Debtors' books and records are all maintained at Debtor Impacts Products and assets and liabilities are not accounted for on a Debtor by Debtor basis.

This fact is further exemplified in the Schedules and Statements and monthly operating reports ("MORs") filed by the Debtors. The Schedules and Statements and MORs, although technically presented on a Debtor by Debtor basis, show that only Debtor Impact Products has any activity to report. Additionally, attempting to separate the assets and liabilities of each Debtor would not only be costly, depleting the Estates' already limited resources and potentially leaving Creditors with little to no Distributions, but likely would be impossible at this stage. Accordingly, in the Debtors' view, the benefits of substantive consolidation of the Debtors significantly outweigh the

47

costs and delay of separating the assets and the liabilities of each Debtor and, thus, the Estates of all of the Debtors should be deemed substantively consolidated.

The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the substantive consolidation of the Debtors and their respective Estates for all purposes relating to the Plan, including for purposes of voting, confirmation, and distributions.  If this substantive consolidation is approved, then for all purposes associated with the confirmation and consummation of the Plan, all assets and liabilities of the Debtors shall be treated as though they were merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor, to the extent such exist, shall be considered eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors. Moreover, (a) no distribution shall be made under the Plan on account of any Intercompany Interest, if any, held by any one of the Debtors in any of the other Debtors except to the extent necessary to effect the substantive consolidation provided for herein, (b) all guaranties of any one of the Debtors of the obligations of any of the other Debtors, to the extent such exist, shall be eliminated so that any Claim against any one of the Debtors, and any guaranty thereof executed by any of the other Debtors, shall be one obligation of the consolidated Debtors' Estates, and (c) every Claim that is timely Filed or to be Filed in the Chapter 11 Cases of any of the Debtors shall be deemed Filed against the consolidated Estates and shall be one Claim against, and one obligation of, the Estates.

Notwithstanding any provision of the Plan to the contrary, any holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts shall be Allowed only once as if such Claim were against a single Debtor.

Any alleged defaults under any applicable agreement, including Executory Contracts and Unexpired Leases, with the Debtors arising from substantive consolidation under the Plan shall be deemed unenforceable as of the Effective Date.

## <u>ARTICLE IX</u>
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    <u>Rejection of Executory Contracts and Unexpired Leases</u>

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) is the subject of a motion to assume such Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (ii) is a contract, release, or other agreement or document entered into in connection with the Plan; or (iii) is an Insurance Policy.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the rejection of the Executory Contracts and Unexpired Leases rejected pursuant to the Plan.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

**B.      Insurance Policies**

Notwithstanding anything to the contrary in the Combined Plan and Disclosure Statement, the Plan Supplement, the Confirmation Order, the Liquidation Trust Agreement, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of or object to any releases):

a.  all Insurance Policies are treated as and deemed to be Executory Contracts under the Plan and, on the Effective Date, each of the Debtors or the Liquidation Trustee, as applicable, shall be deemed to have assumed all Insurance Policies;

b.  on and after the Effective Date, the Liquidation Trustee, on behalf of the Debtors, shall become and remain liable in full for all of their and the Debtors' obligations under the Insurance Policies regardless of whether such obligations arise before or after the Effective Date, and without the need or requirement for Insurers to file or serve any Proof of Claim, Cure Claim, or a request, application, claim, proof or motion for payment or allowance of any Administrative Claim;

c.  nothing alters, modifies, amends, impairs or otherwise affects the terms or conditions of any Insurance Policy or the rights and obligations thereunder; and

d.  the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XIV of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (ii) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XIV of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (iii) to the extent permissible under applicable non-bankruptcy law and in accordance with the terms of the Insurance Policies, the Insurers to cancel any Insurance Policies, and take other actions relating to the Insurance Policies (including effectuating a setoff).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors', or the Liquidation Trust's, as applicable, foregoing assumption of each of the Insurance Policies.

In addition, on and after the Effective Date, the Liquidation Trust shall not terminate or otherwise reduce, limit, or restrict the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers, officers, members, and trustees of the Debtors who served in such capacity at any time prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies, shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such policy regardless of whether such directors, managers, officers, members, or trustees remain in such positions after the Effective Date.   Notwithstanding anything to the contrary in Article XIV, all of the Debtors' current and former directors', managers', officers', members', and trustees' rights, if any, as beneficiaries of the D&O Liability Insurance Policies are preserved to the extent set forth herein.

## C.    Indemnification Obligations

Subject to the last sentence of this paragraph, any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtors' organizational documents, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall survive Confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; provided, however, that all monetary obligations under this provision shall be limited solely to available insurance coverage and neither the post-Effective Date Debtors, the Liquidation Trust, nor any of the assets thereof shall be liable for any such obligations.

Any Claim based on the Debtors' indemnification obligations shall not be a Disputed Claim or subject to any objection under Bankruptcy Code section 502(e)(1)(B).   The Debtors' indemnification obligations shall not apply to or cover any Claims, suits, or actions against a Person that result in a Final Order determining that such Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty.

## D.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the later of (i) the date set forth in an order of the Bankruptcy Court (including the Confirmation Order) authorizing the Debtors to reject contracts or leases pursuant to section 365 of the Bankruptcy Code (unless the order authorizing such rejection provides otherwise), (ii) thirty (30) days after the claimant is served with notice of the applicable Court order, and (iii) the Effective Date. **Absent further order of the Bankruptcy Court, any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time may be forever barred, estopped, and enjoined from: (a) asserting such Claim against the Debtors, their estates, the Liquidation Trust, the Liquidation Trustee, or the property of**

any of the foregoing, or thereafter filing a Proof of Claim with respect thereto in the Chapter 11 Cases; (b) with respect to such Claim, being treated as a Creditor of the Debtors for the purposes of voting upon the Plan; and (c) receiving or being entitled to receive any payment or Distribution from the Debtors or the Liquidation Trust, as applicable, with respect to such Claim, without further order of the Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims.

### E.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Liquidation Trust expressly reserves and do not waive any right to receive, or any continuing obligation of a counterparty to provide warranties or continued obligations concerning goods or services previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

### F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### G.    Reservation of Rights

Nothing contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Liquidation Trust has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidation Trust, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

### H.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE X
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.      The Plan May Not Be Accepted

The Debtors can make no assurances that the requisite acceptances of the Plan will be received. In the event that the Plan is not accepted by Creditors, the Chapter 11 Cases may be converted to chapter 7 of the Bankruptcy Code.

### B.      The Plan May Not Be Confirmed

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determines that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met.  Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' assets could be implemented and what distribution the Holders of Allowed Claims would receive.  If an alternative cannot be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

### C.      Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors'

estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

## D.    Objections to Classification of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to re-solicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

## E.    Failure to Consummate the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

## F.    Debtor Release and/or Injunction Provisions May Not Be Approved

The Combined Plan and Disclosure Statement contains a Debtor release and certain exculpations and injunction language.  Parties are urged to read these provisions carefully to understand how

53

Confirmation and Consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.

There can be no assurance that the Debtor Release and injunction, as provided in Article XIV of the Plan, will be granted.  If the Bankruptcy Court does not grant such relief, this may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

## G.    Reductions to Estimated Creditor Recoveries

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially.  The amount of cash realized from the liquidation of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

## H.    Certain Tax Considerations

### 1.    Certain U.S. Federal Income Tax Consequences

A summary description of certain U.S. federal income tax consequences of this Combined Plan and Disclosure Statement is provided below.  The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of this Combined Plan and Disclosure Statement as discussed herein.  Only the potential material U.S. federal income tax consequences to the Debtors and to hypothetical Holders of Claims who are entitled to vote to accept or reject this Combined Plan and Disclosure Statement are described below.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations promulgated and proposed thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No opinion of counsel has been sought or obtained with respect to any tax consequences of this Combined Plan and Disclosure Statement, and no tax opinion is being given in this Combined Plan Disclosure Statement.  No rulings or determinations of the IRS or any other tax authorities have been obtained or sought with respect to any tax consequences of this Combined Plan and Disclosure Statement, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of this Combined Plan and Disclosure Statement.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated

in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the Holders of Claims. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, CERTAIN EXPATRIATES OR FORMER LONG-TERM RESIDENTS OF THE UNITED STATES, GOVERNMENTAL AUTHORITIES, OR AGENCIES, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, RETIREMENT PLANS, INDIVIDUAL OR TAX-DEFERRED ACCOUNTS, MUTUAL FUNDS, INSURANCE COMPANIES, BANKS, OR OTHER FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS, REAL ESTATE INVESTMENT TRUSTS, AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX AND MEDICARE TAX ARE NOT DISCUSSED HEREIN.

(a)   *Consequences to the Debtors*

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the Debtors in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(1)(A) of the Tax Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted or is effected pursuant to an approved plan of reorganization by the Bankruptcy Court. In such a case, instead of recognizing income, the taxpayer is required, under section 108(b) of the Tax Code, to reduce certain of its tax attributes by the amount of COD income. The attributes of the taxpayer are to be reduced in the following order: current year Net Operating Losses ("NOLs") and NOL carryovers, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards. The reduction in the foregoing tax attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged. Section 108(b)(5) of the Tax Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other tax attributes in the order stated above. In addition to the foregoing, section 108(e)(2) of the Tax Code provides a further exception to the realization of COD income upon the discharge of

debt in that a taxpayer will not recognize COD income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

The Debtors may realize COD income as a result of this Combined Plan and Disclosure Statement. The ultimate amount of any COD income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of all assets transferred to Holders of Claims issued on the Effective Date.

In general, if a debtor sells property to a third party it will recognize taxable income equal to the difference between the amount realized on the sale and its tax basis in such assets sold. In addition, if a debtor conveys appreciated (or depreciated) property (i.e., property having an adjusted tax basis less (or greater) than its fair market value) to a creditor in cancellation of debt, the debtor must recognize taxable gain or loss (which may be ordinary income or loss, capital gain or loss, or a combination of each) equal to the excess or shortfall, respectively, of such fair market value over the debtor's adjusted tax basis in such property.

(b)    *Tax Consequences in Relation to the Liquidation Trust*

On the Effective Date, the Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement, and shall take all steps necessary to establish the Liquidation Trust in accordance with this Combined Plan and Disclosure Statement, which shall be for the benefit of the Beneficiaries. Additionally, on the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date) the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Liquidation Trust all of their rights, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with Bankruptcy Code section 1141, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims and liens, subject only to (i) the beneficial interests in the Liquidation Trust, and (ii) the expenses of the Liquidation Trust, as provided for in the Liquidation Trust Agreement and herein. The tax consequences of the Plan in relation to the Liquidation Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretive authority regarding certain changes in the tax law.

The Liquidation Trust shall be governed by the Liquidation Trust Agreement and administered by the Liquidation Trustee. The powers, rights, responsibilities, and compensation of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement. The Liquidation Trustee shall hold and distribute the Liquidation Trust Assets in accordance with this Combined Plan and Disclosure Statement and the Liquidation Trust Agreement. Other rights and duties of the Liquidation Trustee and the Beneficiaries shall be as set forth in the Liquidation Trust Agreement.

After the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date), the Debtors shall have no interest in the Liquidation Trust Assets. To the extent that any Liquidation Trust Assets cannot be transferred to the Liquidation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Bankruptcy Code section 1123 or any other provision of the Bankruptcy Code, such Liquidation Trust Assets shall be deemed to have been retained by the Debtors and the Liquidation Trust shall be deemed to have been designated as a representative of the Debtors pursuant to Bankruptcy Code section 1123(b)(3)(B) to enforce and pursue such

Liquidation Trust Assets on behalf of the Debtors for the benefit of the Beneficiaries. Notwithstanding the foregoing, all net proceeds of such Liquidation Trust Assets shall be transferred to the Liquidation Trust, to be distributed in accordance with this Combined Plan and Disclosure Statement.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and the Liquidation Trustee will take this position on the Liquidation Trust's tax return accordingly.  The Beneficiaries shall be treated as the grantors of the Liquidation Trust and as the deemed owners of the Liquidation Trust Assets.  For U.S. federal income tax purposes, the transfer of assets to the Liquidation Trust will be deemed to occur as (i) a first-step transfer of the Liquidation Trust Assets to the Holders of Allowed Claims and (ii) a second-step transfer by such Holders to the Liquidation Trust.  As a result, the transfer of the Liquidation Trust Assets to the Liquidation Trust should be a taxable transaction, and the Debtors should recognize gain or loss equal to the difference between the tax basis and fair value of such assets.  In addition, as detailed above, if the total fair value of the Liquidation Trust Assets is less than the total of the Allowed Claims (that have been deducted for federal income tax purposes) the Debtors will recognize COD income equal to such difference.

As soon as possible after the transfer of the Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trustee shall make a good faith valuation of the Liquidation Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, Liquidation Trustee, and the Holders of Claims receiving beneficial interests in the Liquidation Trust shall take consistent positions with respect to the valuation of the Liquidation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.  The Liquidation Trust shall in no event be dissolved later than five years from the creation of such Liquidation Trust unless the Bankruptcy Court, upon motion within the six month period prior to the fifth anniversary (or within the six month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five years with a private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets.

If the Liquidation Trust were not to qualify as a "liquidating trust," as described above, the Liquidation Trustee will take the position that it is a partnership for U.S. federal income tax purposes.  In either case, each Beneficiary will include its distributive share of income, as reported to it by the Liquidation Trustee, and may not receive sufficient cash to satisfy its tax liability.  The IRS may take the position that the Liquidation Trust should be taxed as a corporation for U.S. federal income tax purposes.  If the IRS were to prevail in that position, the Liquidation Trust would be subject to U.S. federal income tax which would reduce the return to a Beneficiary.  Each Beneficiary is urged to consult with its own tax advisor.

As detailed above, the transfer of the Liquidation Trust Assets to the Liquidation Trust could give rise to taxable income or loss equal to the difference between the tax basis and fair value of the Liquidation Trust Assets.

With respect to any COD income recognized due the transfer of the Liquidation Trust Assets to the Liquidation Trust, section 108(a)(1)(A) of the Tax Code should apply and thus any COD income should be excluded.  However, any NOLs (or other tax attributes) remaining after the use of said NOLs to offset taxable income generated by the asset transfers will be reduced by the amount of such COD income excluded above.

(c)    <em>Consequences to Holders of Class 3 General Unsecured Claims</em>

Pursuant to this Combined Plan and Disclosure Statement, each Holder of a Class 3 Allowed General Unsecured Claim against the Debtors will receive in satisfaction of its Claim a *pro rata* share of the GUC Recovery.  The U.S. federal income tax treatment to Holders of Allowed General Unsecured Claims may depend in part on the tax basis a Holder has in its Claim, and, in some circumstances, what gave rise to or the nature of the Holder's Claim.

As set forth above, for federal income tax purposes, the Class 3 General Unsecured Claims will be satisfied by the deemed transfer to them of the Liquidation Trust Assets followed by a deemed contribution of said assets to the Liquidation Trust in exchange for their *pro rata* share of the GUC Recovery.  It is intended that the Liquidation Trust be treated as a liquidating trust for federal income tax purposes and, if it does not so qualify, as a partnership for federal income tax purposes.

Because of the nature of the Liquidation Trust Assets, the deemed transfer by the Debtors of the Liquidation Trust Assets could cause a Holder to recognize gain, or loss, due to said transfer.  The Liquidation Trust Assets that will be deemed transferred to Holders of Class 3 General Unsecured Claims consist of various assets including the Causes of Action (and proceeds thereof).  To the extent that the (i) fair market value of the *pro rata* beneficial interest in the Liquidation Trust Assets that a Holder of a Class 3 General Unsecured Claim receives, exceeds (or is less than) (ii) the Holder's tax basis in such Claim, the Holder should recognize gain (or loss) on such deemed transfer equal to such excess.  The Holder's tax basis in a Claim will generally be equal to the Holder's cost therefore (subject to the below discussion regarding original issue discount ("OID")).  Such gain (or loss) could be capital or ordinary in nature depending on the status of the Holder, the genesis and nature of the Claim being satisfied, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized will generally be characterized as a capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A Creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest or OID.  A Creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such Creditor realizes an overall gain or loss as a result of surrendering its Claim.  A Creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.  Pursuant to Article XIII.D of the Plan, distributions with respect to a

58

Claim will be allocated first to the principal portion of such Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

Under the Plan, a portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest or OID on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. If the payment does not fully satisfy all principal and interest or OID on Allowed Claims, the extent to which payment will be attributable to accrued interest or OID is unclear. Whether the applicable Holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims. Creditors should consult their own tax advisors.

        (d)    *Information Reporting and Withholding*

In connection with the Combined Plan and Disclosure Statement, the Debtors and the Liquidation Trustee will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Plan will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Plan. In the case of any non-U.S. Holders, if applicable, the Liquidation Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Accordingly, such Holders should consult their tax advisors with respect to

the U.S. federal income tax consequences of the Plan, including owning an Interest in the Liquidation Trust.

In general, information reporting requirements may apply to Distributions pursuant to the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund; *provided, that* the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

## ARTICLE XI
## THE LIQUIDATION TRUST AND THE LIQUIDATION TRUSTEE

### A.    Liquidation Trust Criteria

On the Effective Date, the Liquidation Trust will be established and become effective for the benefit of the Beneficiaries. The Liquidation Trust Agreement shall (i) be in form and substance consistent in all respects with this Plan and satisfactory to the Debtors and the Committee and (ii) contain customary provisions for trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure continued treatment of the Liquidation Trust as a grantor trust and the Beneficiaries as the grantors and owners thereof for federal income tax purposes. All relevant parties will take all actions necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust. The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth in and will be governed by the Liquidation Trust Agreement, the Plan, and the Confirmation Order.

## B.     Purpose of the Liquidation Trust

The Liquidation Trust will be established for the primary purpose of liquidating its assets; pursuing the Retained Causes of Action; reconciling and objecting to asserted Claims; and making distributions to Beneficiaries in accordance with Treas. Reg. § 301.7701-4(d), Revenue Procedure 94–45, 1994.28 I.R.B. 124, the Plan, Confirmation Order, and the Liquidation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

The Debtors believe that establishing the Liquidation Trust pursuant to the Plan is in the best interests of the Debtors' Estates and their stakeholders.  The Liquidation Trust provides a mechanism by which potential recoveries for Beneficiaries can be preserved for investigation and prosecution by the Liquidation Trustee, without the burdensome administrative cost of continuing the Chapter 11 Cases.  Allowing the Liquidation Trustee to pursue the Causes of Action provides the best chance for Beneficiaries to receive a recovery on their Allowed Claims.

Further, to continue the Chapter 11 Cases or convert these cases to chapter 7 would result in greater administrative and professional fees and expenses that would likely decrease, if not erase, any recovery that Beneficiaries may receive from the prosecution of the Causes of Action.

## C.     The Liquidation Trust Assets

As detailed herein, the Liquidation Trust Assets include: (a) Retained Causes of Action; (b) any other Claims and Causes of Action that are not Purchased Assets under the Sale Order; (c) any other remaining Assets of the Estates, including, without limitation, the Additional Excluded Cash, Excluded Excess Cash, and the Remaining Professional Fee Escrow Amounts, if any; and (d) the proceeds of each of the foregoing.

### 1.     Retained Causes of Action

Pursuant to the Stalking Horse APA, and as approved pursuant to the Sale Order, the Purchaser purchased substantially all of the Debtors' assets including all Avoidance Actions, with the exception of certain Avoidance Actions against the Excluded Vendors, and all of the rights, claims, or causes of action of the Debtors of any kind, including those available under the Bankruptcy Code, against any officer, director, employee, manager or Affiliate of, or lender to, any of the Debtors or any of their respective Affiliates (and the proceeds of any insurance policies related to any such rights, claims, or causes of action) arising at any time prior to the Closing.  Such Avoidance Actions, rights, claims, and causes of action, were waived and released in full immediately upon Closing.

Per the Final DIP Order, and as memorialized in Amendment No. 1 to the Stalking Horse APA, the following claims and causes of action were excluded from the Sale and were deemed Excluded Assets: (a) Avoidance Actions against the Excluded Vendors and (b) any other causes of action (including commercial tort claims) against the Excluded Vendors.

Accordingly, the Retained Causes of Action to be contributed to the Liquidation Trust include, among other things, (a) the Avoidance Actions against the Excluded Vendors; (b) any other rights, claims, or causes of action of the Debtors of any kind against the Excluded Vendors; and (c) the

61

action filed against Access Partners, Inc. and Paul Haddad under Case No. 1:24-cv-00195 (collectively, the "Retained Causes of Action"). The Debtors and the Liquidation Trust shall not pursue any Causes of Action against the Released Parties.

The Retained Causes of Action are being preserved and contributed by the Debtors to the Liquidation Trust so that these Retained Causes of Action may be investigated and prosecuted, if possible, by the Liquidation Trustee with any recoveries resulting therefrom to be distributed to the Beneficiaries of the Liquidation Trust.

### 2.    Remaining Assets of the Estates

Pursuant to the Committee Settlement and the Final DIP Order, the Debtors, the Committee, the Prepetition Secured Parties, the DIP Lender, and HIG agreed to leave agreed to set aside certain funds to fund the wind down of the Debtors' Estates (also referred to as the Wind Down Budget). *See* Final DIP Order ¶ 42.

As set forth in the Final DIP Order, the Wind Down Budget includes an additional line item titled "Additional Excluded Cash" in the amount of $1,350,000. *Id.*  Further, as agreed to between the Purchaser and the Debtors, the Stalking Horse APA was amended to provide that (a) fifty-percent (50%) of Excess Cash is an Excluded Asset under the Stalking Horse APA; *provided, however,* that no more than $600,000 of Excess Cash shall be an Excluded Asset (the "Excluded Excess Cash"); and (b) in the event that the Debtors, on the Closing Date have insufficient cash on hand or remaining availability under the DIP Financing to fund the Additional Excluded Cash, the Purchase Price (as defined in the Stalking Horse APA) shall be increased by the amount necessary to fund the Shortfall Amount; *provided, however*, that in no event shall the Shortfall Amount exceed $545,000. *Id.*  On the Closing Date, the Excluded Excess Cash in the amount of $600,000 and the Additional Excluded Cash in the amount of $1,350,000 was funded to the Debtors and will be used to fund recoveries to Holders of Allowed Claims.

On the Effective Date, the Debtors estimate that they will have approximately [$_____] of Cash on hand, inclusive of the Excluded Excess Cash, the Additional Excluded Cash and the Wind Down Budget.

In addition, to preserve the Estates' cash and fund the Liquidation Trust, (a) the DIP Lender and the Prepetition Secured Parties agreed to waive any rights to receive a Distribution, including their Prepetition Secured Party Deficiency Claims, on account of any and all Claims that such parties may have against the Debtors and the Debtors' Estates, including from the Additional Excluded Cash, and (b) HIG agreed to waive any and all Claims against the Debtors, the Debtors' Estates and the Purchaser Released Persons (as defined in the Stalking Horse APA). Retaining this Cash for the Estates will help to ensure the Liquidation Trust is properly funded. The Liquidation Trust Agreement will also grant authority to the Liquidation Trustee to raise additional financing to investigate and prosecute the Causes of Action and to otherwise administer his duties under the Liquidation Trust Agreement.

Additionally, the Debtors will transfer all other remaining assets in their possession as of the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date) or as soon thereafter as is practicable to the Liquidation Trust,

including all contractual rights and obligations, if any, of the Debtors under the Stalking Horse APA (including section 8.6 and 11.4 thereof), all Excluded Assets, and Causes of Action (that were not purchased by the Purchaser). Further, pursuant to section 8.5 of the Stalking Horse APA, the Liquidation Trust will have access to Confidential Information (as defined in the Stalking Horse APA) that is necessary to, among other things, investigate and prosecute the Retained Causes of Action.[7] Further, the Purchaser shall retain possession of all accounting, business, financial, and tax records, and information relating to the Purchased Assets or Assumed Liabilities (as defined in the Stalking Horse APA) that are in existence on the Closing Date and transferred to the Purchaser for a period of at least three years from the Closing Date and in no case for a period less than the time during which the Liquidation Trust is in existence. Furthermore, under the Stalking Horse APA, the Purchaser is required to give the Debtors notice and an opportunity to retain any such records in the event that the Purchaser determines to destroy or dispose of them after such period. *See* Stalking Horse APA § 11.4(b)

The Liquidation Trustee will also review whether any insurance policies held by the Debtors provide a source of recovery to Beneficiaries of the Liquidation Trust, including whether any such insurance policies cover the Causes of Action.

For the avoidance of doubt, the Liquidation Trust Assets shall not include: (a) Cash held in the Professional Fee Escrow Account for the benefit of Professional Fee Claims, but shall include the Remaining Professional Fee Escrow Amounts; or (b) causes of action released pursuant to Article XIV.C hereof or exculpated pursuant to Article XIV.E hereof, none of which release or exculpate claims related to the Retained Causes of Action.

## D.    Beneficiaries of the Liquidation Trust

The Beneficiaries of the Liquidation Trust are the Holders of Liquidation Trust Interests, whether individually or as agent on behalf of one or more other Entities. To the extent Holders of Allowed Claims are entitled to Distributions from the Liquidation Trust in accordance with the terms of the Combined Plan and Disclosure Statement, such Holders are each a Beneficiary.

## E.    Distribution of the Liquidation Trust Assets

The Liquidation Trust Assets, including any recovery from the prosecution of the Retained Causes of Action, if any, will be distributed in accordance with the Plan, the Confirmation Order, and the Bankruptcy Code.

As detailed herein, the projected recoveries for the Beneficiaries range from 0-100%. The Debtors have provided this estimated range because it would be mere speculation to assess any value to the

---

[7] *See* Stalking Horse APA, § 8.5 ("From and after the date hereof, Sellers shall not, directly or indirectly, disclose, reveal, divulge or communicate to any Person other than authorized officers, directors and employees of Purchaser or use or otherwise exploit for its own benefit or for the benefit of anyone other than Purchaser, any Confidential Information except . . . as necessary solely to wind down any of Sellers' estates or in connection with the enforcement of the rights of, or the defense of any Action against or involving any Seller or its officers, directors and Affiliates; provided, however, that in the event disclosure is allowable pursuant to the foregoing clause (i), Sellers shall, to the extent reasonably possible and legally permissible, provide Purchaser with prompt notice of such requirement prior to making any disclosure so that Purchaser may seek, at its sole cost and expense, an appropriate protective order.").

Causes Action and any potential recovery therefrom for Beneficiaries. Recoveries for Beneficiaries will depend significantly on the value of the Liquidation Trust Assets, including the Retained Causes of Action. This value is not reasonably calculable at this time and will depend on, among other things, the viability of any such Retained Causes of Action, the creditworthiness of any defendants of such Retained Causes Action, and the cost to investigate and bring Retained Causes of Action on behalf of the Liquidation Trust.

## F.    <u>Transfer of Assets to the Liquidation Trust</u>

The Debtors and the Liquidation Trustee will establish the Liquidation Trust on behalf of the Beneficiaries pursuant to the Liquidation Trust Agreement, with the Beneficiaries to be treated as the grantors and deemed owners of the Liquidation Trust Assets. The Debtors will irrevocably transfer, assign, and deliver to the Liquidation Trust, on behalf of the Beneficiaries, all of their rights, title, and interests in the Liquidation Trust Assets, notwithstanding any prohibition on assignment under non-bankruptcy law. The Liquidation Trust will accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Beneficiaries, subject to the Plan and the Liquidation Trust Agreement.

On the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date), all Liquidation Trust Assets will vest and be deemed to vest in the Liquidation Trust in accordance with section 1141 of the Bankruptcy Code; *provided, that* the Liquidation Trust, with the consent of the Liquidation Trustee, may abandon or otherwise not accept any Liquidation Trust Assets that the Liquidation Trustee believes, in good faith, have no value to the Liquidation Trust. Any Assets the Liquidation Trust so abandons or otherwise does not accept shall not vest in the Liquidation Trust. As of the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date), all Liquidation Trust Assets vested in the Liquidation Trust shall be free and clear of all liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order. Upon the transfer by the Debtors of the Liquidation Trust Assets to the Liquidation Trust or abandonment of Liquidation Trust Assets by the Liquidation Trust, the Debtors will have no reversionary or further interest in or with respect to any Liquidation Trust Assets or the Liquidation Trust. Notwithstanding anything herein to the contrary, the Liquidation Trust and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

Upon the occurrence of the Effective Date, the Debtors' remaining books and records that were not sold pursuant to the Stalking Horse APA shall be transferred to the Liquidation Trust, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession.

For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Debtors shall not transfer or be deemed to have transferred to the Liquidation Trust any Claims or Causes of Action (i) released pursuant to Article XIV.C hereof to the extent of any such release or (ii) exculpated pursuant to Article XIV.E hereof to the extent of any such exculpation.

## G.     Interests in the Liquidation Trust Assets

Each Beneficiary shall have a beneficial interest in the Liquidation Trust Assets as provided for in Article V.B.

## H.     Appointment of the Liquidation Trustee

The Liquidation Trustee shall be appointed and identified in the Plan Supplement.

## I.     Rights and Powers of the Debtors and the Liquidation Trustee

### 1.     Powers of the Debtors and the Liquidation Trustee

All distributions under the Plan shall be made on the Effective Date by the Debtors or thereafter by the Liquidation Trustee or its designees.  After the Effective Date, the Liquidation Trustee shall have the right to object to, allow, or otherwise resolve any Claim.

The Debtors and the Liquidation Trustee, as applicable, shall not be required to give any bond or surety or other security for the performance of their respective duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Bankruptcy Court requires the Debtors or the Liquidation Trust, as applicable, to post a bond or surety, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Liquidation Trust.

### 2.     Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Liquidation Trustee on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Liquidation Trustee shall be paid in Cash from the Liquidation Trust Assets without any further notice to or action, order, or approval of the Bankruptcy Court.

## J.     Distribution and Withholding

Notwithstanding anything in the Plan to the contrary, the Liquidation Trust will make, or cause to be made, all Distributions under the Plan other than (i) those distributions made by the Debtors on the Effective Date and (ii) distributions from the Professional Fee Escrow Account in accordance with this Plan.

The Liquidation Trust may withhold from amounts distributable to any Entity any and all amounts, determined in the Liquidation Trustee's sole discretion, required to be withheld by the Plan, or applicable law, regulation, rule, ruling, directive, or other governmental requirement.

## K.     Insurance

The Liquidation Trustee may maintain customary insurance coverage for the protection of the Liquidation Trustee and Professionals retained by the Liquidation Trust on and after the Effective Date.  The cost of such insurance shall be deemed a trust administrative expense.

**L.**      **Other Rights and Remedies**

In addition to the Liquidation Trustee's rights and duties with respect to the Liquidation Trust, on and after the Effective Date, the Liquidation Trustee will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court.

On the Effective Date, the Liquidation Trust shall: (i) take possession of all books, records, and files of the Debtors and their Estates, in all forms including electronic and hard copy, other than the Debtors' Professionals' work product and other documents; and (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidation Trust determines, in accordance with the Liquidation Trust Agreement, that retention of same is no longer necessary or required.  Any and all rights to conduct investigations with respect to Causes of Action or claims not released by the Debtors and to assert such Causes of Action shall vest with the Liquidation Trust and shall continue until dissolution of the Liquidation Trust and the Liquidation Trust shall be deemed a successor in interest to the Debtors will all requisite standing and authority to pursue such rights, including the Causes of Action, as if neither the Confirmation Date nor the Effective Date had occurred.  The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Liquidation Trustee.

**M.**      **Priority Claims Reserve**

On the Effective Date, the Liquidation Trustee shall establish the Priority Claims Reserve by depositing Cash from the Liquidation Trust Assets in the amount of all anticipated Allowed Priority Tax Claims and Allowed Other Priority Claims.  The Priority Claims Reserve shall be used to pay Allowed Priority Tax Claims and Allowed Other Priority Claims.  If all or any portion of a Priority Tax Claim or Other Priority Claim shall become a Disallowed Claim, or is reclassified as a General Unsecured Claim, then the amount on deposit in the Priority Claims Reserve attributable to such surplus or such Disallowed Claim or reclassified Claim, including the interest that has accrued on said amount while on deposit in the Priority Claims Reserve, shall remain in the Priority Claims Reserve to the extent that the Liquidation Trustee determines necessary to ensure that the Cash remaining in the Priority Claims Reserve is sufficient to ensure that Allowed Priority Tax Claims and Allowed Other Priority Claims will be paid in accordance with the Plan. Any amounts remaining in the Priority Claims Reserve after payment of all Allowed Priority Tax Claims and Allowed Other Priority Claims shall be transferred to the Liquidation Trustee to be distributed pursuant to the Liquidation Trust Agreement.

**N.**      **Disputed Claims Reserve**

The Liquidation Trustee may maintain, in accordance with the Liquidation Trustee's powers and responsibilities under the Plan and the Liquidation Trust Agreement, a Disputed Claims Reserve. The Liquidation Trustee may, in its reasonable discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Liquidation Trust Agreement, as Disputed Claims are resolved pursuant to Article XIII hereof, and such amounts may be distributed on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.

The Liquidation Trust will pay taxes on the taxable net income or gain allocable to Holders of Disputed Claims on behalf of such Holders.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Liquidation Trust as a result of the resolutions of such Disputed Claims.

## O.    **Attribution of Income**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), allocations of taxable income of the Liquidation Trust (other than taxable income allocable to the Liquidation Trust's claims reserves) among Holders of Claims will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidation Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust.  Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidation distribution of the remaining Liquidation Trust Assets.  The tax book value of the Liquidation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Liquidation Trust Assets are transferred to the Liquidation Trust, adjusted in accordance with tax accounting principles prescribed by the IRS, the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

## P.    **Current Basis**

All income of the Liquidation Trust will be subject to tax on a current basis.

## Q.    **Tax Identification Numbers**

The Liquidation Trustee may require any Beneficiary to furnish to the Liquidation Trustee its Employer or Taxpayer Identification Number as assigned by the IRS or certify to the Liquidation Trustee's satisfaction that distributions to the Beneficiary are exempt from backup withholding. The Liquidation Trustee may condition any distribution to any Beneficiary upon receipt of such identification number.  If after reasonable inquiry, any Beneficiary fails to provide such identification number to the Liquidation Trustee, the Liquidation Trustee shall deem such Beneficiary's Claim as Disallowed and no distribution shall be made on account of such Beneficiary's Claim.

R.     **Wind Down**

In addition to the Liquidation Trustee's rights and duties with respect to the Liquidation Trust, on and after the Effective Date, the Liquidation Trustee will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court that pertain to the Liquidation Trust.   The Liquidation Trustee shall retain the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates or take any other action of the Debtors required or permitted under the Bankruptcy Code.

As soon as practicable after the Effective Date, the Liquidation Trustee shall: (i) cause the Debtors to comply with, and abide by, the terms of the Stalking Horse APA; (ii) complete and file all final or otherwise required federal, state, and local tax returns for the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of each Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (iii) take such other actions as it may be necessary or desirable to carry out the purposes of the Plan.   From and after the Effective Date, the Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and (ii) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.   In addition, the Debtors shall be deemed to have cancelled all Interests pursuant to this Plan.   For the avoidance of doubt, (x) the dissolution of the Debtors shall not have any effect, in any manner, on the Retained Causes of Action that the Liquidation Trustee may assert in accordance with the Plan and the Liquidation Trust Agreement and (y) notwithstanding each of the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

S.     **Termination of the Liquidation Trust and Liquidation Trustee**

Notwithstanding any provision of the Plan to the contrary, the Liquidation Trust shall be dissolved upon the earlier of the distribution of all Liquidation Trust Assets to the Beneficiaries required to be made by the Liquidation Trust under the Plan or the fifth anniversary of the creation of the Liquidation Trust, *provided, however*, notwithstanding the foregoing, the Liquidation Trust shall be dissolved no later than five years from the Effective Date unless the Bankruptcy Court, upon a motion filed within six months of the fifth anniversary of the Effective Date or the end of any extension period approved by the Bankruptcy Court (the filing of which shall automatically extend the term of the Liquidation Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets; *provided, however*, that adequate funding exists for such extension period as determined by the Bankruptcy Court; *provided, further*, that each request for an extension shall be approved by the Bankruptcy Court within six months prior to the conclusion of the extended term.   After (i) the final Distribution of the balance of the assets or proceeds of the Liquidation Trust pursuant to the Plan, (ii) the filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (iii) any

other action deemed appropriate by the Liquidation Trustee, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

The duties, responsibilities, and powers of the Liquidation Trustee will terminate in accordance with the terms of the Liquidation Trust Agreement.

**T.     Transfer of Beneficial Interests**

Notwithstanding anything to the contrary in the Plan, beneficial interests in the Liquidation Trust shall not be transferrable except upon death of the interest holder or by operation of law.

**ARTICLE XII**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.     Timing and Calculation of Amounts to Be Distributed**

Each Holder of an Allowed Claim against the Debtors shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors, or the Liquidation Trustee, on behalf of the Debtors or the Liquidation Trust, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article XIII. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

**B.     Delivery of Distributions and Undeliverable, Unclaimed, of Forfeited Distributions**

**1.     Record Date for Distribution**

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

**2.     Delivery of Distributions**

Except as otherwise provided herein, the Debtors or the Liquidation Trustee, as applicable, shall make distributions to Holders of Allowed Claims and Allowed Interests on or after the Effective Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided, that* the manner of such distributions shall be determined at the discretion of the Debtors or the Liquidation Trustee, as applicable; *provided, further,* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3.      **Payments and Distributions on Disputed Claims**

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims shall, in the Liquidation Trustee's reasonable discretion, be deemed to have been made by the Liquidation Trustee on the Effective Date, unless the Liquidation Trustee and the applicable Holder of such Claim agree otherwise.

4.      **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Liquidation Trustee, as applicable, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interests, other than with respect to Professional Fee Claims, until all Disputed Claims or Interests held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

5.      **Fractional Cents**

Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

6.      **Minimum Distributions**

Notwithstanding anything to the contrary contained in the Plan, the Liquidation Trustee shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $100. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $100 shall be forever barred from asserting such Claim against the Liquidation Trust.

7.      **Undeliverable Distributions and Unclaimed Property**

All distributions to Holders of Allowed Claims not made by wire transfer shall be made at the address of such Holder as set forth in the Claims Register maintained in the Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Liquidation Trustee) or, in the absence of a Filed Proof of Claim, the Schedules and Statements, on the Effective Date. The responsibility to provide the Liquidation Trustee a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Liquidation Trustee have any obligation to determine a Holder's current address. Nothing contained in the Plan shall require the Liquidation Trustee to attempt to locate any Holder of an Allowed Claim. Amounts in respect of undeliverable distributions made by Liquidation Trustee shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Liquidation Trust or the Estates until the earlier of the date that such undeliverable distributions

70

are claimed by such Holder and the date 90 days after the date the undeliverable distributions were made.  Following the expiration of 90 days after the date the undeliverable distributions were made, the amounts in respect of undeliverable distributions shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidation Trust or Estates, as applicable, automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan.  Such Holder shall be deemed to have forfeited its right to any reserved and future distributions from the Liquidation Trust or the Estates, and the Claims of such Holder shall be forever barred.

### 8.    Forfeiture of Distribution

If the Holder of a Claim fails to cash a check payable to it within the time period set forth in this Article XII.B hereof, fails to claim an undeliverable Distribution within 90 days after issuance thereof, or fails to complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9 within 120 days of the request by the Liquidation Trustee for the completion and return to it of the appropriate form, then such Holder shall be deemed to have forfeited its right to any reserved and future distributions from the Liquidation Trust or Estates, and the Claims of such Holder shall be forever barred.  The forfeited distributions shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidation Trust or Estates automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan.

### 9.    Further Distributions Not Feasible

Notwithstanding anything to the contrary in the Plan, if the Liquidation Trustee determines that any Beneficiaries of the Liquidation Trust no longer exist or cannot otherwise be reasonably ascertained, or the Liquidation Trustee determines that the Liquidation Trust Assets are insufficient to make any further distribution economically justifiable, the Liquidation Trustee shall distribute the Liquidation Trust Assets that constitute Cash in accordance with the Liquidation Trust Agreement and thereafter seek to terminate the Liquidation Trust.

### 10.    Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Debtors or the Liquidation Trustee, as applicable, by check, wire transfer or such other method as the Debtors or the Liquidation Trustee, as applicable, deem appropriate under the circumstances.  Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Liquidation Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  For purposes of effectuating distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. dollars pursuant to the applicable published exchange rate in effect on the Effective Date.  Cash payments in the form of checks issued by the Liquidation Trustee shall be null and void if not cashed within 90 days of the date of the issuance thereof and shall be deemed undeliverable distributions.

## C.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Debtors or the Liquidation Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on it by any

11584845v.10

Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. The Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. The Liquidation Trustee may require, in the Liquidation Trustee's sole and absolute discretion and as a condition to the receipt of any distribution, that the Holder of an Allowed Claim complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9, as applicable to each Holder. Notwithstanding any other provision of the Plan, (i) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Liquidation Trust in connection with such distribution, and (ii) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Liquidation Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trust in connection with such distribution.

## D.    Allocations

To the extent that any Allowed Claim entitled to a distribution from Liquidation Trust Assets or non-Liquidation Trust Assets consists of indebtedness and accrued but unpaid interest thereon, such distributions shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

## E.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in section 506(b) of the Bankruptcy Code, a Final Order, the Plan, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

## F.    Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

## G.    Setoffs and Recoupment

The Liquidation Trustee may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Liquidation Trust may have against the Holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim

hereunder shall constitute a waiver or release by the Liquidation Trust of any such claim that it may have against such Holder.

### H.    Claims Paid or Payable by Third Parties

#### 1.    Claims Paid or Payable by Third Parties

The Debtors or the Liquidation Trustee, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or, as applicable, the Liquidation Trust, including on account of recourse to collateral held by third parties that secure such Claim.  No distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' Insurance Policies, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Claim has exhausted all remedies with respect to such Insurance Policy, other non-Debtor payment agreement, or collateral, as applicable.  To the extent a Holder of a Claim receives a distribution on account of a Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.  To the extent that one or more of the Debtors' Insurers or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), or collateral or proceeds from such collateral are used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### 2.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, payments to Holders of Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by any Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

### ARTICLE XIII
### PROCEDURES FOR RESOLVING CONTINGENT,
### UNLIQUIDATED AND DISPUTED CLAIMS AND INTERESTS

### A.    Allowance of Claims and Interests

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidation Trustee, shall have and shall retain any and all rights and defenses that the Debtors had with respect

73

to any Claim or Interest, except with respect to any Claim or Interest deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any Final Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim. Notwithstanding anything to the contrary herein, if a timely objection to a Proof of Claim has not been Filed or the Schedules and Statements have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules and Statements by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the Proof of Claim or the Claim set forth in the Schedules and Statements relates will be treated as an Allowed Claim.

## B.    Prosecution of Objections to Claims and Interests

Other than with respect to Professional Fee Claims, prior to the Effective Date, the Debtors, and on or after the Effective Date the Liquidation Trustee, or their designees, as applicable, shall have the authority to File objections to Claims or Interests, and the exclusive authority to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtors' Estates to any and all Claims or Interests, regardless of whether such Claims or Interests are in a Class or otherwise.

Subject to the foregoing sentence, from and after the Effective Date, the Liquidation Trustee (i) may settle or compromise any Disputed Claim in accordance with the Liquidation Trust Agreement and Article XIII hereof and (ii) shall succeed to the Debtors' rights with respect to any objections Filed by the Debtors that remain pending as of the Effective Date. From and after the Effective Date, the Liquidation Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.    Estimation of Claims

On and after the Effective Date, the Liquidation Trustee, may, at any time, request that the Bankruptcy Court estimate (i) any Disputed Claim pursuant to applicable law and (ii) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Liquidation Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtors or the Liquidation Trustee, as applicable, may elect to pursue

74

additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Liquidation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### D.    Expungement or Adjustment to Claims Without Objections

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Debtors or the Liquidation Trustee (or the Notice, Claims, and Solicitation Agent at, as applicable, the Debtors' or the Liquidation Trustee's direction), without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### E.    Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the later of (i) 120 days after the Effective Date and (ii) such other period of limitation as may be specifically fixed by the Debtors or the Liquidation Trustee, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

### F.    Disallowance of Claims

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Liquidation Trustee. All Claims Filed on account of an indemnification obligation to a director, manager, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the applicable Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such

Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

## G.    Amendments to Claims

On or after the applicable Bar Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Debtors or the Liquidation Trustee, as applicable. Absent such authorization, any new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action.

## H.    No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed as set forth herein, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

## I.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Liquidation Trustee shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

## ARTICLE XIV
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

## A.    Termination of Claims and Interests

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction and release, effective as of the Effective Date, of Claims, Interests, and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and causes of action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim or Proof of Interest based

upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the termination of all Claims and Interests subject to the occurrence of the Effective Date.

## B.    Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, and required to be satisfied pursuant to the Plan, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Liquidation Trustee to evidence the release of such lien, including the execution, delivery, and filing or recording of such releases, and shall authorize the Debtors and the Liquidation Trustee to file UCC-3 termination statements (to the extent applicable) with respect thereto. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such liens.

## C.    Releases by the Debtors

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released by each and all of the Debtors and their Estates (collectively, the "Releasing Parties"), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action by, through, for, or because of the foregoing entities, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Releasing Parties whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Releasing Parties would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates, the business operations of the Debtors, actions taken by the Board of Directors, the  purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court sale and restructuring efforts, the Prepetition ABL Facility,

77

the Prepetition Term Loan Facility, the Debt Purchase Transaction, the Sale, the Chapter 11 Cases, the Liquidation Trust, the Liquidation Trust Agreement, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Combined Plan and Disclosure Statement, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Combined Plan and Disclosure Statement, the Plan Supplement, or the Liquidation Trust Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided that* any right to enforce the Plan, the Confirmation Order and the Liquidation Trust Agreement is not so released; provided, further, that nothing herein shall release any party from their obligations under the Stalking Horse APA or the Ancillary Documents (as defined in the Stalking Horse APA).

### D.    <u>HIG Releases</u>

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors and their Estates is deemed released by HIG, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any cause of action by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of HIG whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that HIG would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates, the business operations of the Debtors, actions taken by the Board of Directors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court sale and restructuring efforts, the Prepetition ABL Facility, the Prepetition Term Loan Facility, the Debt Purchase Transaction, the Sale, the Chapter 11 Cases, the Liquidation Trust, the Liquidation Trust Agreement, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Combined Plan and Disclosure Statement, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Combined Plan and Disclosure Statement, the Plan Supplement, or the Liquidation Trust Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, that* any right to enforce the Plan, the Confirmation Order and the Liquidation Trust Agreement is not so released.

### E.    <u>Exculpation</u>

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is exculpated from, any liability to any Holder of a cause of action, Claim, or Interest for any act or omission taking place between the Petition Date and the

Effective Date of the Plan in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Combined Plan and Disclosure Statement, the Plan Supplement, the Liquidation Trust Agreement, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Combined Plan and Disclosure Statement or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted bad faith, breach of fiduciary duty, willful misconduct, actual fraud or gross negligence, but in all respects such Entities shall be entitled to assert appropriate affirmative defenses, including reliance upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

## F.    Injunction

Except as otherwise expressly provided in the Combined Plan and Disclosure Statement or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Liquidation Trustee, the Liquidation Trust, the Exculpated Parties, the Released Parties, or the successors and assigns of each of the foregoing and any of their assets and properties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of, in connection with or with respect to any such Claims or Interests; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to applicable law or otherwise, provided that, this provision does not enjoin setoff or recoupment related to any Claims or Interests arising after the Effective Date.

## G.    Protections Against Discriminatory Treatment

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but

before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.    Document Retention

On and after the Effective Date, the Liquidation Trustee may maintain documents in accordance with its standard document retention policy, as may be altered, amended, modified, or supplemented by the Liquidation Trustee.

## I.    Reimbursement or Contribution

If the Bankruptcy Court Disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (i) such Claim has been adjudicated as non-contingent or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## J.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## ARTICLE XV
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

## A.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XV.B hereof:

    **1.**    The Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order) in form and substance acceptable to the Debtors, and shall:

        (a)    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

        (b)    decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)     authorize the Debtors, as applicable or necessary, to: (i) make all distributions and issuances as required under the Plan; and (ii) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement; and

(d)     authorize the implementation of the Plan in accordance with its terms.

**2.**     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

**3.**     the Liquidation Trustee shall have been appointed and the Liquidation Trust Agreement shall have been executed and become effective;

**4.**     the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

**5.**     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan and shall be in form and substance acceptable to the Debtors; and

**6.**     the Debtors shall have implemented all transactions contemplated herein in a manner consistent in all respects with the Plan, pursuant to documentation acceptable to the Debtors in their discretion.

## B.     Waiver of Conditions

The conditions to Consummation set forth in this Article XV may be waived by the Debtors without further notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## C.     Effect of Failure of Conditions

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Combined Plan and Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, any Holders of Claims or Interests, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

## ARTICLE XVI
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

## A.     Modification and Amendments

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Combined Plan and Disclosure Statement.  Subject to certain restrictions and requirements set forth in section 1127

of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Combined Plan and Disclosure Statement, one or more times, before or after Confirmation, with the consent of the Committee, such consent not to be unreasonably withheld, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Combined Plan and Disclosure Statement, or remedy any defect or omission or reconcile any inconsistencies in the Combined Plan and Disclosure Statement or the Confirmation Order in such matters as may be necessary to carry out the purposes and intent of the Plan.

**B.**     **Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.**     **Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder of a Claim or Interest, or any other Entity.

## ARTICLE XVII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

**1.**     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

**2.**     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

11584845v.10

**3.** resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Liquidation Trustee amending, modifying, or supplementing, after the Effective Date, pursuant to Article IX, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

**4.** ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

**5.** adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

**6.** adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

**7.** enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Combined Plan and Disclosure Statement or the Plan Supplement;

**8.** enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code, including but not limited to the Sale Order;

**9.** resolve any cases, controversies, suits, disputes, or causes of action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

**10.** issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

**11.** resolve any cases, controversies, suits, disputes or causes of action with respect to the releases, injunctions, and other provisions contained in Article XIV, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

**12.** resolve any cases, controversies, suits, disputes or causes of action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article XII.H.1;

**13.** enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or that relate to the Combined Plan, and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Combined Plan and Disclosure Statement;

15.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on, or after the Effective Date;

21.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article XIV;

23.     hear and determine all Causes of Action;

24.     enforce all orders previously entered by the Bankruptcy Court; and

25.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XVIII
## MISCELLANEOUS PROVISIONS

### A.     Immediate Binding Effect

Subject to the terms hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Debtors' Estates, the Liquidation Trust, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases,

and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim, Interest, or debt has voted on the Plan.

**B.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Liquidation Trust, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Combined Plan and Disclosure Statement, any statement or provision contained in the Combined Plan and Disclosure Statement, or the taking of any action by any Debtor with respect to the Combined Plan and Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

**D.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**E.      Dissolution of the Committee**

The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee.  The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors, including, but not limited to, any cases, controversies, suits, or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order.  The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have an Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date, except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

**F.**    <u>**Notices**</u>

To be effective, all notices, requests and demands to or upon the Debtors shall be in writing (which may be by email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received and telephonically confirmed, addressed to the following:

| **Debtors** | **Counsel to the Debtors** |
|---|---|
| Thomas Studebaker, Chief Restructuring Officer<br>**SUPPLY SOURCE ENTERPRISES, INC.**<br>c/o Triple P RTS<br>300 North LaSalle Drive, Suite 1420<br>Chicago, Illinois 60654<br>Email: tstudebaker@pppllc.com | Felicia Gerber Perlman<br>Bradley Thomas Giordano<br>Carole M. Wurzelbacher<br>**MCDERMOTT WILL & EMERY LLP**<br>444 West Lake Street,<br>Chicago, IL 60606<br>Email: fperlman@mwe.com<br>bgiordano@mwe.com<br>cwurzelbacher@mwe.com<br><br>- and -<br><br>M. Blake Cleary<br>R. Stephen McNeill<br>Katelin A. Morales<br>**POTTER ANDERSON & CORROON LLP**<br>1313 North Market Street, 6th Floor<br>Wilmington, Delaware 19801<br>Email: bcleary@potteranderson.com<br>rmcneill@potteranderson.com<br>kmorales@potteranderson.com |
| **U.S. Trustee** | **Counsel to the Committee** |
| Benjamin A. Hackman<br>Malcolm M. Bates<br>**UNITED STATES DEPARTMENT OF JUSTICE**<br>Office of the United States Trustee<br>District of Delaware<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801<br>Email: Benjamin.a.hackman@usdoj.gov<br>Malcolm.m.bates@usdoj.gov | Mark Franke<br>Brandon Batzel<br>**ORRICK, HERRINGTON & SUTCLIFEE LLP**<br>51 West 52nd Street<br>New York, NY 10019<br>Email: mfranke@orrick.com<br>bbatzel@orrick.com<br><br>- and -<br><br>Domenic E. Pacitti<br>Richard M. Beck<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>919 N. Market Street, Suite 1000<br>Wilmington, DE 19801<br>Email: dpacitti@klehr.com<br>rbeck@klehr.com |

11584845v.10

**G.**      **Entire Agreement**

Except as otherwise indicated, the Combined Plan and Disclosure Statement and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**H.**      **Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice, Claims, and Solicitation Agent at https://veritaglobal.net/supplysource or the Bankruptcy Court's website at http://www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**I.**      **Non-Severability of Plan Provisions**

The provisions of the Plan, including its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors consistent with the terms set forth herein; and (iii) non-severable and mutually dependent.

**J.**      **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**K.**      **Closing of Chapter 11 Cases**

The Liquidation Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

Dated: August 8, 2024
Wilmington, Delaware

*/s/ Thomas Studebaker*
Thomas Studebaker
Chief Restructuring Officer of the Debtors

88